**Muigawah MUNUSAMY**

v.

**McCLELLAND ENGINEERS, INC. et al.**

**Steven Peter CROW**

v.

**OCEANEERING INTERNATIONAL, INC.**

**William Wayne PICCO**

v.

**GLOBAL MARINE DRILLING CO. et al.**

**Civ. A. Nos. B–81–800–CA, B–82–143–CA and B–82–709–CA.**

United States District Court, E.D. Texas, Beaumont Division.

Jan. 30, 1984.

Benton Musslewhite, G. Robert Friedman, Friedman & Chaffin, Houston, Tex., for plaintiffs.

James Patrick Cooney, Royston, Rayzor, Vickery & Williams, Marion E. McDaniel, Eastham, Watson, Dale & Forney, Jack L. Albritton, Fulbright & Jaworski, G. Byron Sims, Brown, Sims & Ayre, Houston, Tex., for defendants.

## MEMORANDUM ORDER

JOE J. FISHER, District Judge.

Before the court are three maritime death and injury cases brought by foreign plaintiffs against American and foreign defendants. The Defendants in each case urge the court to dismiss under the doctrine of *forum non conveniens.* They argue that the court must choose to apply foreign rather than U.S. law because the Plaintiffs' injuries have insufficient connection with the U.S.

In effect, the Defendants insist that the foreign Plaintiffs, injured abroad by the negligence of U.S. owned firms, cannot pursue a cause of action in tort against them in a U.S. court even though jurisdiction and venue are in each case proper.

While the facts of the cases differ, the issues raised by the Defendants are essentially the same in each and relate to basically common fact patterns. The court therefore consolidates the causes for purposes of ruling upon the Defendants' motions to choose foreign law and to dismiss for *forum non conveniens.*

The Plaintiffs insist the court has jurisdiction by virtue of:

(1) 28 U.S.C. 1350, which provides that "[t]he district courts ... have original jurisdiction of any civil action by an alien for a

tort only, committed in violation of the law of nations or a treaty of the United States;"

(2) 28 U.S.C. 1331 for those rights of action "aris[ing] under the Constitution, laws or treaties of the United States ...;"

(3) 28 U.S.C. 1332 insofar as the Plaintiffs' claims are between "citizens of a State and citizens or subjects of a foreign state;"

(4) 28 U.S.C. 1333 to the extent they plead a "civil case of admiralty or maritime jurisdiction ..."

It is the opinion of the court, and Defendants do not disagree, that subject matter jurisdiction is proper.

The Plaintiffs' complaints advance the following causes of action:

(1) the Jones Act, 46 U.S.C. 688, giving injured seamen a right of recovery for negligence of their employers;

(2) the General Maritime Law of the United States and of Nations;

(3) the Death on the High Seas Act, 46 U.S.C. 761, which creates a right of recovery for wrongful death on the high seas beyond a marine league of the U.S. coast;

(4) as created by the laws of foreign countries per 46 U.S.C. 764, providing that a right of action under foreign law for wrongful death on the high seas "may be maintained in an appropriate action in admiralty in courts of the U.S. ...;"

(5) the Texas Death [and Injury] in a Foreign State Statute, Tex.Rev.Civ.Stat. Ann. art. 4678 (Vernon 1952 & Supp.1982), extending to citizens of nations with equal treaty rights the right to enforce foreign or Texas rights of action for wrongful death and personal injuries in the courts of this State;

(6) Texas common law of negligence and products liability.

Venue has not been challenged and no interdistrict transfer sought. The court finds venue proper under 28 U.S.C. 1391. Defendants demand that the court choose foreign law to govern each case. They persuasively argue that recent opinions of

the Court of Appeals for the Fifth Circuit mandate the choice of foreign law and entail dismissal per *forum non conveniens*. See *De Oliveira v. Delta Marine Drilling Co.*, 707 F.2d 843 (5th Cir.1983); *Bailey v. Dolphin International, Inc.*, 697 F.2d 1268 (5th Cir.1983); *Vaz Borralho v. Keydril Co.*, 696 F.2d 379 (5th Cir.1983); *Zekic v. Reading & Bates Drilling Co.*, 680 F.2d 1107 (5th Cir.1982); *Chiazor v. Transworld Drilling Co.*, 648 F.2d 1015 (5th Cir.1981).

## FORUM NON CONVENIENS

### DISMISSAL "IN EXCEPTIONAL CIRCUMSTANCES"

■ The doctrine of *forum non conveniens* allows a court, "in exceptional circumstances," to "resist imposition upon its jurisdiction" even when jurisdiction and venue, as here, are proper. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504, 67 S.Ct. 839, 841, 91 L.Ed. 1055 (1946). Invocation of the doctrine suggests some misuse of the venue by the plaintiff, for instance, when he seeks "justice blended with some harassment." *Id.* at 507, 67 S.Ct. at 842.

It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed. *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843.

*Gilbert* fully enunciated the federal doctrine of *forum non conveniens*. *Cowan v. Ford Motor Co.*, 713 F.2d 100 (5th Cir. 1983). The Court explained that its invocation "presupposes at least two forums in which the defendant is amenable to process; the doctrine furnishes criteria for choice between them." *Gilbert*, 330 U.S. at 507, 67 S.Ct. at 842.

■ Initially, the district court must find that an acceptable alternative forum exists. *Cowan*, 713 F.2d at 103. If its existence be established, "the court, exercising its dis-

cretion, must balance and consider both the private interests and public interests at stake in the choice of forum." *Id.*

In *Gilbert* the Court outlined private interests which control a *forum non conveniens* dismissal:

(1) relative ease of access to sources of proof;

(2) availability of compulsory process for attendance of unwilling witnesses;

(3) the cost of obtaining attendance of willing witnesses;

(4) possibility of a view of the premises; and

(5) enforceability of a judgment.

The public interests noted by the Court are:

(1) "administrative difficulties" of crowded dockets;

(2) the imposition of jury duty upon citizens whose community has no relation to the litigation; and

(3) burdening the court with applying "a law foreign to itself." *Id.* 330 U.S. at 508–09, 67 S.Ct. at 843.

The Court did not explain the relative importance of the public and private interests. In a later opinion, however, the Court noted that "dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." *Piper Aircraft v. Reyno*, 454 U.S. 235, 249, 102 S.Ct. 252, 262, 70 L.Ed.2d 419.

The Court concluded that "a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum." *Id.*, 454 U.S. at 255, 102 S.Ct. at 265, *citing Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 831, 91 L.Ed. 1067 (1947). "When the home forum has been chosen, it is reasonable to assume that this choice is convenient." *Piper*, 454 U.S. at 255–56, 102 S.Ct. at 265. The court agrees, particularly where, as here, the home forum of the *defendant* has been chosen. To the con-

trary however, the Supreme Court viewed the assumption as "much less reasonable" when the plaintiff is foreign and has chosen a U.S. forum. *Id.*

In addition, the choice of law influences the *forum non conveniens* dismissal decision in maritime cases. This is so because, if United States law applies, the court would normally entertain the suit. *Bailey*, 697 F.2d at 384, citing *Fisher v. Agios Nicolaos V.*, 628 F.2d 308, 315 (5th Cir. 1980) *cert. denied sub nom. Valmas Bros. Shipping, S.A. v. Fisher*, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981). But see *Piper*, 454 U.S. at 257, 102 S.Ct. at 266. When foreign law applies, however, "the court may dismiss the suit if there is another more convenient forum." *Fisher v. Agios Nicolaos V.*, 628 F.2d at 314.

## THE CHOICE OF LAW

The Defendants ask the court to find that U.S. law does not govern the torts alleged by the Plaintiffs. In particular, Defendants assert the Jones Act and the General Maritime Law do not apply.

The Supreme Court addressed choice of law in maritime injury cases in three consistent opinions: *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). Eight "factors" are said to influence the choice of law in maritime injury cases:

(1) place of the wrongful act;

(2) law of the flag;

(3) allegiance or domicile of the plaintiff;

(4) allegiance of the defendant shipowner;

(5) place of the contract;

(6) inaccessibility of a foreign forum;

(7) law of the forum;

(8) defendant's base of operations.

The "factors" suggest a simple, mechanistic approach to choice of law. The appearance is deceptive, however, because

the "factors" are neither all comparable nor of equal significance. For example, "factors" (1) through (5) and (8) are themselves potential choices of law, as well as facts which influence the choice of law. "Factor" (6) is irrelevant to choice of law; it pertains only to the propriety of *forum non conveniens* dismissal. Moreover, "factor" (7), which suggests the court should compare the laws of the potential forums, has since been negated by the Court. *See Piper*, 454 U.S. 235, 102 S.Ct. 252.

Courts and counsel who attempt to apply *Lauritzen* and its siblings, *Romero* and *Rhoditis*, by adding the number of national "contacts" with the "factors" miss the point. The *Lauritzen* discussion of "factors" was not a demonstration of *how* to make a choice of law in maritime cases. The discussion illustrated *why* the Court's conclusion was proper: that the law of the flag governs maritime injury claims. *Lauritzen* simply discussed the potential choices of law in maritime cases. The Court used the facts of the *Lauritzen* case as *examples* supporting a rule of law, not as *reasons* for making a choice of law.

In *Lauritzen* the Court emphasized the "universal rule of maritime law ... which gives cardinal importance to the law of the flag." The Court in *Romero* held the law of the flag controlled the maritime tort in U.S. territorial waters. The Court relied on the shipowner's "base of operations" to apply U.S. law in *Rhoditis*, effectively equating the newly found "factor" with law of the flag.

In the wake of the Court's decisions above, the law was that:

(1) the place of the wrongful act was of minimal significance. *Lauritzen*, 345 U.S. at 584, 73 S.Ct. at 929; *Romero*, 358 U.S. at 384, 79 S.Ct. at 486;

(2) law of the flag was virtually the automatic choice of law, absent powerful reasons to the contrary. *Lauritzen*, 345 U.S. at 584–86, 73 S.Ct. at 929–30; *Romero*, 358 U.S. at 384, 79 S.Ct. at 486; *Rhoditis*, 398 U.S. at 308, 90 S.Ct. at 1733;

(3) the allegiance or domicile of the injured was not a weighty consideration, nor was

(4) the allegiance of the shipowner given great importance. *Lauritzen*, 345 U.S. at 586–87, 73 S.Ct. at 930; *Romero*, 358 U.S. at 383, 79 S.Ct. at 486; *Rhoditis*, 398 U.S. at 310, 90 S.Ct. at 1734;

(5) the place of the contract was virtually insignificant absent a forum selection clause as to tort claims. *Lauritzen*, 345 U.S. at 588–89, 73 S.Ct. at 931; *Romero*, 358 U.S. at 383, 79 S.Ct. at 486; *Rhoditis*, 398 U.S. at 310, 90 S.Ct. at 1734; and

(6) the base of operations was effectively equivalent to the law of the flag as the preferred choice of law, at least where the base was in the U.S. *Rhoditis*, 398 U.S. at 310, 90 S.Ct. at 1734.

In other words, the Court held the law of the flag or its functional equivalent, base of operations, to be the choice of law in maritime injury cases both here and abroad.

Later applications of the *Lauritzen-Romero-Rhoditis* analysis by district and appellate courts, however, made the relative significances of the "factors" almost infinitely variable. *See, e.g., De Oliveira*, 707 F.2d 847; *Borralho*, 696 F.2d 379; *Chiazor*, 648 F.2d 1015. In the Fifth Circuit, for example, choice of law now appears to consist of "weighing" the "substantiality of contacts"—not just "quantitatively," but "qualitatively," as well—between the complaint and the U.S. Moreover, the analysis entails the realization that "certain of the eight (*Lauritzen* and *Rhoditis*) factors may be substantial in one context ... [and] of lesser importance in another." *Chiazor*, 648 F.2d at 1018. The possibility of a shift in substantiality introduced by *Chiazor* greatly reduces the utility of the already questionable "factor weighing" approach to the choice of law. The court fears that each "factor's" significance is sufficiently obscure or variable to justify any judicial conclusion.

## CHOICE OF LAW AND *FORUM NON CONVENIENS* IN THE FIFTH CIRCUIT

The controlling opinions, called by one Plaintiff's counsel "the rig cases," are the *parentela* of *Chiazor v. Transworld Drilling Co.*, 648 F.2d 1015 (5th Cir.1981). Therein the Court of Appeals affirmed the district court's decision "declining jurisdiction" over the death claim of a Nigerian employee of a U.S. owned Nigerian firm killed aboard a relatively immobile drilling vessel owned by a Bahamian subsidiary of a U.S. firm. Concluding that the district court had necessarily, although not expressly, rejected U.S. law, the Court of Appeals found no abuse of discretion in the dismissal for *forum non conveniens.*

The decision of a district court to apply Italian law to the claim of a Yugoslav injured aboard his American employer's affiliates' drilling vessel in Italian territorial waters was affirmed. *Zekic v. Reading & Bates Drilling Co.*, 680 F.2d 1107 (5th Cir. 1982). The Court of Appeals remanded the case, however, fearing the district court had ordered its dismissal as "an automatic response." The court emphasized that the district judge should exercise his discretion in deciding to dismiss, rather than infer that *Chiazor* required dismissal automatically.

In *Vaz Borralho v. Keydril Co.*, 696 F.2d 379 (5th Cir.1983), the court affirmed the district court's rejection of American law to control the wrongful death claim of a Brazilian seaman injured abroad in the employ of an American owned Brazilian drilling company. The court found the "contacts" of the claim to be insufficiently "substantial" and "qualitatively" inadequate to apply U.S. law. The district court did not, the Court of Appeals held, abuse its discretion in dismissing under *forum non conveniens.* The court noted that "the distinction between foreign and resident plaintiffs for choice of law purposes ... is fully justified, as recognized by the Supreme Court ..." *citing Piper Aircraft v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419, and *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254. Moreover, the court noted, "[t]he Constitution does not require the United States, as a condition of applying its laws to its own citizens and residents, to be courthouse or law maker to the world." *Borralho*, 696 F.2d at 390.

The district court dismissed the claims of a Filipino employee of a Houston-based Panamanian subsidiary of a Texas corporation, drowned off Indonesia when his employer's drilling vessel capsized. The appellate court concluded the "contacts" with foreign nations were "clearly more substantial than those with the United States." *Bailey v. Dolphin International, Inc.*, 697 F.2d 1268 (5th Cir.1983). As in *Zekic*, the Court of Appeals remanded and suggested a revised dismissal order. The objective, it noted, " 'is not to locate the *forum conveniens*, but to avoid the *forum non conveniens.*' " *Bailey*, 697 F.2d at 1279, *quoting*, Casad, *Long Arm & Convenient Forum*, 20 Kan.L.Rev. 1, 14 (1971). Of course, such a dismissal assumes the existence of at least one specific *forum* more *conveniens.*

The Court of Appeals rejected the district court's decision to apply U.S. law to the claim of a Brazilian injured offshore between a U.S. vessel and a drilling rig operated by a U.S. owned Brazilian company. *De Oliveira v. Delta Marine Drilling Co.*, 707 F.2d 843, 847 (5th Cir.1983). The court held that Brazilian law applied to the claim and that retention of jurisdiction by the U.S. court would work an injustice.

The Defendants offer the above opinions as authority that the foreign seamen before the court should be denied the benefit of U.S. law and trial in a U.S. court, as well. They argue that the substantiality of the foreign "contacts" so outweighs the causes' "contacts" with the U.S. as to make foreign law the proper choice. And a choice of foreign law, Defendants insist, compels the court to dismiss under the doctrine of *forum non conveniens.*

## ECONOMIC INCONVENIENCE?

There exist, the court realizes, compelling economic arguments in favor of deny-

ing the benefits of U.S. law and a U.S. forum to foreigners. The "social cost" imposed by the entertainment of such foreign maritime injury claims is considerable. Even greater is the burden imposed on U.S. corporate assets.[1]

While such economic arguments are rational and persuasive, it appears that the Court of Appeals has not relied thereon. Rather, the court employed carefully crafted, abstract choice of law analyses. Moreover, such economic policy decisions are for Congress to make, and not for the courts. For example, the 1982 amendment to the Jones Act exemplified a change of policy—narrowing the applicability of U.S. law to foreign workers—in response to economic interests. 96 Stat. 1956. See 128 Cong. Rec.S. 14,364 (daily ed. Dec. 10, 1982).[2]

The interest in public, rather than private, economy may be the real reason courts so readily affirm the dismissal of such foreign maritime claims. Although few opinions explicitly say so, *see, e.g., Bailey,* 697 F.2d at 1278, some courts apparently use the *forum non conveniens* dismissal to shrink their dockets. This court well appreciates the dilemma of a growing backlog of cases as filings exceed closings each month. Moreover, since domestic juries and the public fisc support the courts, "native" cases should perhaps have first claim on the resources of the judiciary. If some plaintiffs must be turned away from a crowded courthouse, better they be foreigners than Americans, one might conclude. Congress, however, must make that policy decision, as well. Inasmuch as this court has uncontested jurisdiction of the cases, it is reluctant to decline its exercise absent compelling reasons to do so.

## THE FOREIGN SEAMEN'S "CONTACTS" WITH THE U.S.

Applying the *Lauritzen-Romero-Rhoditis* analysis to the cases, the court finds the following significant: Plaintiffs allege that negligent acts—here and abroad—of American owned firms injured them aboard ves-

---

1. In the typical maritime injury case the foreign plaintiff is limited under foreign law to some type of worker's compensation for his death or injury. Often there are statutory limits to the size of recoveries. By U.S. standards the benefits are generally minimal, if not grossly inadequate. Compared to the plaintiff's wage scale and living standard, however, the foreign benefits seem less niggardly.

But if the plaintiff's sovereign mandates low or even inadequate benefits, why should American owned enterprises not profit therefrom? The lower costs of injuring foreign workers merely reflect the lower costs of foreign labor generally. Comity suggests the foreign nation's opinion, legislative or judicial, of its citizens' worth should be respected. Implicit in the recent opinions of the Court of Appeals for the Fifth Circuit is the notion that U.S. courts should not value the lives and injuries of foreign maritime workers higher than would a foreign court. If not for comity, then for economic reasons, a U.S. court should, it can reasonably be argued, defer to foreign law.

That the foreign plaintiff's recovery in a foreign forum may be substantially lower than in the U.S. simply strengthens the economic argument in favor of ejecting foreigners. Lower damage awards under foreign law equal lower liability for U.S. owned enterprises. And lower liability ultimately translates into higher profits and greater wealth for U.S. citizens. Such for-

eign penury vis a vis that nation's citizens is an economic gain to U.S. investors no less than a foreign land's subsidization of its exports enriches U.S. consumers.

By the same reasoning, the so-called flag of convenience should be respected. In free nations, every flag is one of "convenience." Vessel owners select the most economically beneficial registry available to them, and why not? If U.S. owners can better compete using Liberian or Panamanian flag vessels, for example, what justifies denying them that advantage? Finding a vessel to be *de facto* a U.S. flag ship may simply penalize American investors to reward an alien plaintiff.

Aggressive "unveiling" of corporate *alter egos* has similar economic consequences. U.S. owned enterprises are denied the benefits of reduced and limited liability under foreign law, thereby depleting U.S. assets to reward foreigners.

2. While much of the debate on the amendment spoke euphemistically of the need to "clarify" existing, confusing case law, Senator Long spoke directly to the issue. He remarked, "Mr. President, American offshore service companies and their foreign subsidiaries are being severely impacted [sic] by a multitude of lawsuits, aggregating claims over a billion dollars, brought by foreign offshore oil and gasfield workers." 128 Cong.Rec.S. 14364 (daily ed. Dec. 10, 1982).

sels at sea owned or controlled by U.S. defendants or their foreign surrogates. Clearly, it is arguable whether the claims of the Plaintiffs have "substantial" or even significant "contacts" with the U.S. Such nebulous and misused words simply encourage legal argument *ad nauseam*. Undisputed, however, are the injurious and fatal contacts between the Defendants' vessels and the bodies of the Plaintiffs. Those are the real and truly significant contacts confronting the court.

Contrary to the holdings of the Supreme Court, Defendants insist on foreign choices of law. That Plaintiffs are aliens injured abroad by ostensibly foreign companies is dispositive in the Fifth Circuit, they argue. The Court of Appeals apparently condoned such discrimination, ostensibly relying upon *Piper* and *Lauritzen*. *See Borralho*, 696 F.2d at 390. The court, however, is reluctant to so readily reject the admiralty claims of foreign seamen. Moreover, the court believes that the law in the Fifth Circuit does not so require.

The context of the instant cases is not, the court believes, such as to cause a *"Chiazor* shift" in the substantiality of the *Lauritzen-Rhoditis* "factors." See *Chiazor*, 648 F.2d at 1018. Absent proof that the vessels involved were permanently stationed in foreign territorial waters, the flags of the vessels and the Defendants' bases of operations remain the important facts for choice of law. If the flags or bases of operations of the vessels are either actually or effectively of U.S. identity as alleged, a U.S. choice of law would be virtually compelled by *Lauritzen, Romero,* and *Rhoditis*. The facts crucial to the choice of law decisions require further development.

The undisputed facts, *e.g.*, the non-U.S. *situs* of each tort and the foreign citizenship of the Plaintiffs, are not determinative. As to the foreign *situs*, there is no apparent inequity in requiring a U.S. defendant to answer for his actions, wherever

committed, under U.S. law. This is especially so with maritime tort law, because claims frequently arise outside U.S. territory.

Second, the court perceives no justification or fairness in altering the standard of care imposed upon vessels or maritime employers according to the nationality of the victim. See, e.g., *Rhoditis*, 398 U.S. at 309–10, n. 5, 90 S.Ct. at 1734 n. 5. Moreover, at the time of the torts the Jones Act drew no such distinction between domestic and foreign seamen employed upon U.S. vessels. See, *e.g.*, 46 U.S.C. sec. 688 & 713. Neither should the General Maritime Law be applied discriminatorily to foreign seamen on U.S. vessels, the court believes. *See Romero*, 358 U.S. at 382, 79 S.Ct. at 485.

## "EQUALITY OF TREATMENT TO ALL SEAMEN ..."

Third, the maritime law of the U.S. prohibits such discriminatory treatment of foreign seamen. Shipowners' Liability (Sick and Injured Seamen) Convention, October 24, 1936, 54 Stat. 1693 (the Treaty). The Treaty defines the minimum "liability of ... shipowner[s] in case of sickness, injury, or death of seamen." It does not, however, "affect any law, award, custom, or agreement between shipowners and seamen which ensures more favorable conditions than those provided by th[e] Convention." *Id*. See *DeZon v. American President Lines*, 318 U.S. 660, 667, n. 3, 63 S.Ct. 814, 818 n. 3, 87 L.Ed. 1065 (1942); *O'Donnell v. Great Lakes Co.*, 318 U.S. 36, 42, 63 S.Ct. 488, 491, 87 L.Ed. 596 (1942).

Moreover, the Treaty expressly requires "equality of treatment to all seamen [injured on the high seas] irrespective of nationality, domicile or race." 54 Stat. 1700.[3] The court believes this to be an important requirement, although it appears not to have been raised heretofore. It is the opinion of the court that the clear language of the Treaty forbids choice of law according

---

**3.** One could argue logically that to apply the law of the seaman's nation would provide "equality of treatment." But that proposition has a rheto-

rical flaw relative to the rest of the clause: "irrespective of nationality, domicile, or race."

to the nationality or domicile of the plaintiff.

Supreme Court holdings are not contrary. In *Lauritzen*, for example, the Court did not predicate its choice of law on the seaman's nationality or domicile. Rather, it gave "cardinal importance to the law of the flag," directing that "it must prevail unless some heavy counterweight appears." *Id.*, 345 U.S. at 586, 73 S.Ct. at 930. In *Piper* ḥo seamen were involved, so the Court's discriminatory treatment of foreign plaintiffs did not offend or involve the Treaty.

The Court earlier emphasized the importance of "equality of treatment" and U.S. leadership in maritime tort law. The aim of the Convention, the Court explained, was "to equalize operating costs by raising the standards of member nations to the American level." *Warren v. U.S.*, 340 U.S. 523, 527, 71 S.Ct. 432, 435, 95 L.Ed. 503 (1951). For that reason alone, the court should probably decline to choose foreign law when it imposes a lower standard of care or relief than domestic law.

With respect to not only the Jones Act and General Maritime Law claims of the Plaintiffs, but the wrongful death,[4] negligence, and product liability claims,[5] as well, the court's conclusion is clear: choice of law cannot be influenced by the "nationality, domicile, or race" of the seamen.

Finally, the court perceives the facts crucial to the choice of law determinations to be inseparably woven with the merits of the causes. The apparent extent of effective U.S. ownership and control of: the vessels, the victims' employers, and the other entities involved is such as to require deferring the choice of law until the evidence has been presented on the merits.

Moreover, to decide that, *e.g.*, the Jones Act does not apply is, in effect, to decide that the plaintiff has failed to prove his complaint. At first glance, Defendants seem to urge the equivalent of a summary judgment motion. Implicit in their argument is the proposition that the plaintiff has failed to state a claim for relief. The hidden premise—that such foreign seamen have no cause of action under U.S. maritime law—remains unproven. Since the Plaintiffs allege wrongs committed by American vessels or employers, to reject U.S. law is but to rule on the merits of their claims. Naturally, the court must defer ruling on the merits until all the evidence is presented. If at that time the court chooses foreign law, it will so instruct the juries or rule accordingly.

The court realizes that its decision to apply U.S. law would not necessarily preclude dismissal for *forum non conveniens*. *See, e.g., Bailey,* 697 F.2d at 1274; *Borralho,* 696 F.2d at 384. Out of fairness to the parties, the court must, therefore, consider dismissing the causes for *forum non conveniens* at this time. To wait until trial begins and then dismiss would be unfair to all. It would cause considerable and real, rather than merely abstract, inconvenience.

### IS THIS A *FORUM NON CONVENIENS?*

▉ A *forum non conveniens* dismissal "presupposes at least two forums" wherein the defendant is amenable to process. *Gilbert,* 330 U.S. at 507, 67 S.Ct. at 842. In their briefs, Defendants state that suitable alternative forums exist; that appears to be correct. And although the Defendants have not yet shown it to be true, the court assumes, *arguendo,* that "complete relief

---

4. In the death cases, the court must choose between applying the Death on the High Seas Act or a non-federal wrongful death law. Defendants' argument that DoHSA excludes the other theories is correct, but only if DoHSA applies. Finding DoHSA inapplicable, however, leaves available the Texas and foreign wrongful death actions. Since no jurisdictional problems exist, the Plaintiffs will be able to proceed under some theory in this forum.

5. Whether to apply Texas or foreign law of negligence or products liability raises similar problems. One or another theory, however, will be appropriate. Moreover, since Texas allows plaintiffs to pursue a foreign cause of action in its courts, a choice of foreign law would not result in wasted effort before this court.

**158**

can be obtained in the supposedly more convenient forum." 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure section 3828 (1976).

■ In considering the "convenience" of the parties, particularly of the Defendants, the court relies on the *Gilbert* analysis. Abstract notions of convenience, however, are difficult to apply to real cases. Of necessity, the court must work with concrete facts. In the context of these cases, convenience means money. Inconvenience equals cost, nothing more.

There are two obvious reasons the foreign plaintiff would choose this forum over his home:

(1) to harass the defendants; or

(2) to maximize his recovery.

Perhaps the foreign Defendants can show harassment; they have yet to do so. The U.S. Defendants, however, surely do not suggest that suit in one's home court equals harassment. The court detects no harassment by the Plaintiffs, but believes they chose a U.S. forum for the second reason. It is manifest that the Plaintiffs simply chose the forum with the most advantageous law available to them. "Convenience" had little, if anything, to do with the choice. Neither are the Defendants' dismissal motions concerned with convenience. Like the Plaintiffs, the Defendants simply seek dismissal to a forum where the law is more advantageous to them. So far, it is a zero sum game; the score is tied. For this very reason, a change in substantive law should not be considered in a *forum non conveniens* inquiry. *See Piper*, 454 U.S. at 247, 102 S.Ct. at 261.

### THE PRIVATE INTERESTS

In reviewing the private interests of the litigants, i.e., the costs of preparing and trying a case here versus abroad, the court discerns an approximate balance of the total costs between the alternatives and the parties.

The relative ease of access to sources of proof is identical regardless of the forum. It is not the forum court, after all, but the parties' attorneys,[6] who must go to the sources and gather evidence. Granted that much of the evidence is abroad. How are sources of proof made less accessible by trial in Texas instead of abroad? In either event, the *situs* is no more or less "accessible." The Plaintiffs' attorneys must travel there to gather evidence, as must the Defendants'. Such would be the case were the action tried abroad. Other sources of proof will ordinarily be domestic. For example, expert medical and liability witnesses are likely to be U.S. residents. They too are equally accessible to Plaintiffs and Defendants.

The availability of compulsory process is a potential problem, but not an insolvable one. Moreover, it exists regardless of the forum chosen. Naturally the witnesses abroad are generally beyond the reach of this court, just as U.S. witnesses are beyond a foreign one. Many witnesses, however, are likely to be under the control of the Defendants. Such potential witnesses as employees of the Defendants and their subcontractors, for instance, are under the economic control of the Defendants and require no judicial compulsion to appear.

The assistance of foreign courts in gathering evidence is available via letters rogatory. Fed.R.Civ.P. 28(b); 28 U.S.C. 1781 *et seq.;* see Bishop, International Litigation in Texas: Obtaining Evidence in Foreign Countries, 19 Hou.L.Rev. 361 (1982). Finally, if crucial witnesses must be compelled to offer testimony, the Plaintiffs can be required to file suit in the foreign forums to facilitate discovery in the domestic cases. Both parties should agree, of course, that evidence taken in either forum could be used in the other.

The cost of bringing willing foreign witnesses to trial is an expense that both

---

**6.** The court assumes that the parties were and should be free to choose their counsel for whatever reasons they prefer. Plaintiffs and Defendants have all selected U.S. attorneys, presumably hiring the best available to them. They are free, of course, to retain foreign counsel to assist in the preparations for trial, should they wish.

parties must bear, regardless of the forum chosen. Foreign witnesses must be brought to a U.S. forum; U.S. witnesses must travel to a foreign forum. Other witnesses, like itinerant workers, would require transportation to either forum. Of course, for many such witnesses, depositions or videotaping of their testimony is the preferred form of evidence. Those witnesses need not be transported.

In addition, the court considers the cost of the attorneys' attendance at trial. Their appearance in this forum requires minor travel time. Were the case tried abroad, counsel for Plaintiffs and Defendants would incur the cost of further trips abroad.

The possibility of a view of the premises does not concern the court. The usual exhibits adequately display the maritime worksites where plaintiffs are injured. Considering the hazards of the sea, the court has no desire to view any of the maritime premises here involved, nor would it allow a jury to do so. *See, e.g., Bailey*, 697 F.2d 379 (crewman drowned when rig capsized); *De Oliveira*, 707 F.2d 847 (workman struck by "widowmaker" after fall into sea). As for the parties, they may view the premises with equal ease whichever forum is chosen.

The point is that most of the private expenses are unavoidable. The choice of forum does not eliminate the costs; it merely temporarily shifts *some* to another pocket. The private interests of the Plaintiffs and Defendants are, it appears, virtually in equipoise. There being no "exceptional circumstances," *Gilbert*, 330 U.S. at 504, 67 S.Ct. at 841, the Plaintiffs' choice of forum should not be disturbed by the mundane conflict of private interests.

## THE PUBLIC INTERESTS

Public interests remain to be considered, but they mostly relate to the interests of this court in controlling its swollen docket. Like other federal courts, this one has a steadily growing backlog of cases. And the court does not wish to become a haven for admiralty lawyers in search of a friend-ly port. The court is not yet so unproductive, however, that it must turn away foreign seamen who seek relief from U.S. defendants.

To impose jury duty upon citizens of this district is not burdensome considering the strong economic role of the maritime and petroleum industries in the economy of the Eastern District. The citizens of this community have an intimate relation with the litigation of offshore oil industry and maritime injury claims because so many directly or indirectly make their livings from those industries.

The prospect of "untangling problems in conflict of law" does not deter the court. The court perceives the possibility of applying "law foreign to itself" as a challenge, not grounds for abdication. If the court is inadequate to either task, the Court of Appeals will indubitably correct any errors.

The public interests, the court concludes, do not require dismissal of these Plaintiffs' causes. Moreover, no injustice is likely to result from trial in a federal court. To the contrary, injustice is far more likely to result if the foreign seamen are dismissed. Moreover, such dismissal would be contrary to federal maritime law.

The court understands the Treaty to apply to *forum non conveniens* decisions no less than to choice of law decisions. The Treaty requirement of "equality of treatment to all seamen" dictates that the foreign seaman be treated the same as an American seaman in the same circumstances. It is inconceivable that a federal admiralty court would dismiss an American seaman suing a U.S. vessel or employer on *forum non conveniens* grounds. The court must, therefore, treat these foreign seamen the same. For that reason and given the admiralty court's traditional regard for seamen of all nations, as well as the reluctance of this court to avoid its Constitutional and statutory duties, it is

ORDERED, ADJUDGED and DECREED that the motions of the Defendants to dismiss for *forum non conveniens* be and are hereby DENIED, and the cases

set for jury selection and trial in the next term of the court.