**Raymundo Cerrato SOLANO**

v.

**GULF KING 55, INC., Gulf King Services, Inc., and Gulf King 55, in Rem.**

**Civil Action No. G–98–095.**

United States District Court,
S.D. Texas,
Galveston Division.

Dec. 11, 1998.

Harold Joseph Eisenman, Attorney at Law, Houston, TX, Richard Lee Melancon, Melancon and Hogue, Friendswood, TX, Walter Z. Steinman, Attorney at Law, Bala Cynwyd, PA, for Raymundo Cerrato Solano, plaintiff.

Richard B. Waterhouse, Jr., Pipitone & Seger, Corpus Christi, TX, Daniel Douglas Pipitone, Pipitone and Seger, Houston, TX, for Gulf King 55, Inc., Gulf King Services, Inc., Gulf King 55 in Rem, defendants.

Ronald L. White, Brown Sims Wise & White, Houston, TX, for Ron White, movant.

### ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

This is a personal injury case arising under the Jones Act, 46 U.S.C.App. § 688 et seq. and general maritime law. Plaintiff allegedly suffered an injury on February 23, 1995 while serving aboard the M/V GULF KING 55. He filed this claim against Defendants on February 19, 1998. Now before the

Court is Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment.[1] For the reasons set forth below, Defendants' Motion is **DENIED**.

## I. FACTUAL SUMMARY

Defendants Gulf King 55, Inc. And Gulf King Services, Inc. ("Gulf King") are Texas corporations with their principal places of business in Aransas Pass, Texas. Both businesses are closely held corporations in which members of the owning family, who are American citizens and residents of Texas, own 96 percent of the stock. Defendants own forty-three shrimping vessels, thirty-four of which operate exclusively in the waters off the shore of Nicaragua. Together, these thirty-four vessels comprise what Defendants refer to as the "Nicaragua Fleet." Corporate officers in Defendants' Texas office make all decisions that concern the deployment or sale of any vessel in the Nicaragua Fleet. All operational and maintenance decisions regarding the fleet are made by a "fleet manager," a Nicaragua-based employee who is charged with running the fleet's day-to-day affairs but must consult with Defendants on all major decisions.[2]

The Nicaragua Fleet is the most profitable division owned by Defendants, which also maintain a fleet of shrimping vessels that operates in the waters off of Texas. From 1995 to 1997, the Nicaragua Fleet has generated profits of more than $1.6 million. These profits come entirely from sales in the United States of the shrimp caught in Nicaraguan waters. The shrimp are processed in Nicaragua by a Nicaraguan company called Oceanic, S.A., which receives a flat fee for its work.[3] The processed shrimp are then shipped to Miami, Florida, where Defendants maintain a refrigerated warehouse. From Miami, Defendants sell the shrimp exclusively to United States-based customers. The proceeds attributable to the shrimp produced by the Nicaragua Fleet end up commingled with the proceeds from Defendants' domestic operations.

Each of the vessels in the Nicaragua Fleet sails under the United States flag. According to the testimony of company officials, sailing under the U.S. flag is a condition imposed by Defendants' three primary financing creditors, the Department of Commerce, the National Marine Fishery Service, and the Small Business Administration. Together, those three government agencies have loaned Defendants approximately $2.3 million since 1980. The loans are secured through liens on individual ships in both the Nicaraguan and domestic fleets. To better secure their liens, the creditor agencies require that the ships sail under the U.S. flag and be documented in the United States.

The vessels are all entirely crewed by Nicaraguan citizens and captained for the most part by American citizens. The fleet manager hires a captain for each vessel, who then hires a crew for each shrimping voyage. At the conclusion of each voyage, the fleet manager faxes a payroll request based upon the particular vessel's catch to Defendants in Texas. Defendants then wire the payroll

---

1. The factual and legal issues concerning choice of law in this case are substantially identical to those in the case before this Court styled *Victor Manuel Urbina v. Gulf King 55, Inc. and Gulf King Services, Inc. and GULF KING 49 in rem*, Civil Action No. G–98–143. In that case, the only difference is the identity of the Plaintiff, a Nicaraguan seaman who was injured on a different vessel belonging to Defendants. Accordingly, the Court has issued a substantially similar order in that case addressing the choice of law question raised by Defendants.

2. Defendants have employed five different fleet managers since they began their operations in Nicaragua. Three of the fleet managers have been American citizens, while two have been Nicaraguan citizens. The current fleet manager is an American.

3. When Defendants launched their shrimping operations in Nicaragua, they entered into an agreement with Oceanic through which Oceanic would process all of the shrimp caught and assist Defendants' American ship captains and fleet managers in identifying qualified Nicaraguan seamen and processing payroll requests at the completion of each voyage. Upon receipt of the payroll requests prepared by Oceanic, Defendants would wire the requested funds to Oceanic's Nicaraguan bank account. Oceanic would then pay the seamen. At the same time, Defendants agreed to purchase 50% of Oceanic's stock for the price of $1.1 million. In 1996, Defendants assumed control over all aspects of the shrimping operations, relieving Oceanic of all duties except for processing.

funds to a Nicaraguan bank, where the money is converted into local currency and distributed to the crew.

In this case, Plaintiff is a Nicaraguan citizen who served aboard one of the vessels in Defendants' Nicaraguan Fleet, the M/V GULF KING 55, in February 1995. On February 23 of that year, he was assisting with a line that is used to raise the shrimping nets when the winch controlling the line allegedly reversed itself and sent the line paying out rapidly in the opposite direction. Plaintiff's hand was caught in the line and severely injured. He filed suit against Defendants in this Court on February 19, 1998.

## II. ANALYSIS

The issue confronting this Court is the choice of law governing Plaintiff's claim. Defendants have moved the Court to dismiss Plaintiff's cause of action for failure to state a claim for which relief may be granted. In the alternative, Defendants ask the Court to find based on the summary judgment evidence before it that Nicaraguan law governs this dispute and dismiss all causes of action brought under the Jones Act and general maritime law under the doctrine of forum non conveniens. Each party has submitted evidence outside the pleadings. Consequently, the Court will treat this motion as a Motion for Summary Judgment.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. See id. at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law

will preclude the entry of summary judgment. See id. at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Dixon v. State Farm Fire & Casualty Co., 799 F.Supp. 691 (S.D.Tex.1992)(noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255, 106 S.Ct. at 2513.

The question of whether United States or foreign law applies to a maritime injury case is governed by the Supreme Court trilogy of Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); and Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). Under these cases, the following eight factors determine the choice of law: (1) the allegiance or domicile of the plaintiff; (2) the place of the contract; (3) the allegiance of the defendant shipowner; (4) the law of the flag; (5) the accessibility of the foreign forum; (6) the place of the wrongful act; (7) the law of the forum; and (8) the defendant shipowner's base of operations. These factors, while potentially suggestive of a mechanical approach to determining choice of law, are not all of equal or even comparable significance. See Rhoditis, 398 U.S. at 308–09, 90 S.Ct. at 1733–34; Schexnider v. McDermott International, Inc., 817 F.2d 1159, 1161 (5th Cir.1987); Munusamy v. McClelland Engineers, Inc., 579 F.Supp. 149, 152–53 (E.D.Tex.1984). Generally, the law of the flag and the defendant shipowner's base of operations weigh most heavily in the determination. See Lauritzen, 345 U.S. at 583, 73 S.Ct. at 929 (stating that the law of the flag is of "cardinal importance" in determining applicable law); Rhoditis, 398 U.S. at 309–10, 90 S.Ct. at 1734–35 (holding that the defendant's New York base of operations

favored United States law despite the ship's Greek flag). On the other hand, the place of the wrongful act, the inaccessibility of a foreign forum, and the law of the forum are seldom relevant to the determination. *See Sablic v. Armada Shipping Aps,* 973 F.Supp. 745, 750–51 (S.D.Tex.1997) (citing *Lauritzen,* 345 U.S. at 583, 73 S.Ct. at 928) (stating that the place of the wrongful act carries little weight in shipboard torts because of the numerous jurisdictions through which vessels typically pass); *Munusamy,* 579 F.Supp. at 153 (noting that inaccessibility of a foreign forum and the law of the forum are irrelevant). Moreover, each of the factors may be substantial in one context but insignificant in another. *See Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015, 1018 (5th Cir.1981). The national interests to be served by application of United States law may also influence the weight to be assigned each factor. *See Schexnider,* 817 F.2d at 1161 (citing *Rhoditis,* 398 U.S. at 308–09, 90 S.Ct. at 1733–34).

■ In the present case, the law of the flag is undisputedly that of the United States. The M/V GULF KING 55 was flying the U.S. flag at the time of the accident. Defendants were required to sail under the U.S. flag as a condition of the loans they had received from three government agencies. In addition, Defendants themselves benefited by flying the U.S. flag. As one officer testified, U.S. registration would have protected the vessels of the Nicaragua Fleet in the event that the Nicaraguan government had tried to nationalize any of them, as it had done with other shrimping vessels during periods of political instability. While each of these vessels in the Nicaragua Fleet flew a Nicaraguan flag as well, Plaintiff has offered testimony from a corporate officer that those flags merely served as an indication that the vessels were authorized to fish in Nicaraguan territorial waters. The flag was not a sign of Nicaraguan ownership or registration. The law of the flag clearly favors application of American law.

Defendants argue that the base of operations of the vessel involved in this accident provides a counterweight to the law of the flag. The vessel, like all of those vessels in the Nicaragua Fleet, was permanently stationed in Nicaragua and plied its trade in Nicaraguan waters, departing from and returning to Nicaraguan ports at all times. In some circumstances, this would result in the base of operations factor favoring Nicaraguan law. *See, e.g, Quintero v. Klaveness Ship Lines,* 914 F.2d 717, 723 (5th Cir.1990); *Bailey v. Dolphin International, Inc.,* 697 F.2d 1268, 1275 n. 22 (5th Cir.1983), *overruled on other grounds, In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d 1147 (5th Cir.1987). However, the Court is not convinced that the real base of operations is in Nicaragua. *See Rhoditis,* 398 U.S. at 310, 90 S.Ct. at 1734–35 (warning that "the facade of the operation must be considered as minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States."). Although the vessel's day-to-day operations fell under the supervision of its captains and the Nicaragua-based fleet manager, numerous connections link the entire Nicaragua Fleet to Defendants' headquarters in Aransas Pass, Texas. First, the fleet manager must consult with Defendants on all major decisions, and Defendants make all decisions concerning the deployment or sale of a particular vessel at their Texas headquarters. Second, all shrimp caught by these vessels are shipped to Miami for sale in the United States, the proceeds of which are commingled with those from the sales traceable to Defendants' domestic operations. Finally, the vessel is entirely owned by Defendants, a pair of closely held Delaware corporations which have Texas as their principal place of business. One Texas family holds 96 percent of the stock of these corporations. Together, these connections lead to the conclusion that Defendants' true base of operations is in the United States. Although day-to-day operations are the touchstone for the base of operations analysis in this Circuit, *see Bailey,* 697 F.2d at 1275 n. 22, the fact that the fleet manager required corporate approval for any major day-to-day decisions mitigates against concluding that Nicaragua was Defendants' base. Consequently, the base of operations favors application of U.S. law.

Similarly, the allegiance of Defendants supports application of American law. Defendants are two Delaware corporations who operate principally from their corporate headquarters in Texas. In addition, their stock is almost entirely controlled by two members of the owning family.

Two factors favor application of Nicaraguan law. First, Plaintiff is a Nicaraguan citizen who maintains his residence in that country. Second, the place of the employment contract entered into between Plaintiff and Defendants was Nicaragua. The remaining factors—the place of the alleged wrong, the accessibility of Nicaragua as a forum, and the law of this forum—are not relevant to the determination.

The scorecard of factors, so to speak, thus favors the applicability of American law, with the two most significant factors both supporting that conclusion. The application of these factors is not a mechanical test, of course; the Court is instructed by the controlling precedent to consider the national interests to be served by the choice of American law. *See Schexnider*, 817 F.2d at 1161 (citing *Rhoditis*, 398 U.S. at 308–09, 90 S.Ct. at 1733–34); *Castillo v. Santa Fe Shipping Corp.*, 827 F.Supp. 1269, 1271 (S.D.Tex. 1992). The Court concludes that applying the Jones Act and general maritime law to this dispute would serve at least one interest. Defendants are two profitable companies that derive most of their profits from their Nicaraguan operation. This is in part because Defendants realize a substantial savings due to the lower wages received by the Nicaraguan seamen they employ. The Court has little doubt that any potential recovery to which these Plaintiffs may be entitled in Nicaragua would be significantly lower than that they might receive under the Jones Act. Humane considerations aside, the Court does not need to provide further incentive for corporations like these Defendants to employ foreign nationals in their fishing operations to the exclusion of higher-paid American seamen. Defendants have already received the benefit of their bargain in the form of lower wage obligations and the resulting greater profits; allowing them to escape the obligations of the Jones Act while maintaining such extensive control over the operation of the Nicaragua Fleet vessels such as M/V GULF KING 55 would be a windfall and smacks of manifest exploitation of third-world employees who are least in a position to defend themselves. In addition, the Court notes that Plaintiff and the other Nicaraguan seamen who are employed by Defendants confer a greater economic benefit upon Defendants than do the American seamen Defendants employ in domestic waters. This only underscores the dictate that the control exercised by Defendants over these foreign seamen confers a correlative duty upon them to make commensurate provisions for their welfare. Accordingly, the Court holds that American law, specifically the Jones Act and the general maritime law, governs this action.[4] Defendants's Motion for Dismissal, and, in the alternative, Summary Judgment is therefore **DENIED**.

### III. CONCLUSION

The Court finds as a matter of law that the Jones Act and the general maritime law of the United States governs Plaintiff's claim. This case will be set for trial at a later date. Without commenting on the merits of the claim or defenses asserted, this Court will examine them again at that time.

For the reasons set forth above, Defendants' Motion to Dismiss for Failure to State a Claim or, in the alternative, for Summary Judgment is **DENIED**. The parties are **ORDERED** to bear their own taxable costs and expenses incurred herein to date.

**IT IS SO ORDERED.**

---

**4.** Because United States law governs Plaintiff's claim, the Court need not consider Defendants' arguments in favor of forum non conveniens dismissal. *See Schexnider*, 817 F.2d at 1161 ("First the court determines that United States law does not apply, and then the court balances public and private convenience factors set forth in judicial precedent to determine whether to dismiss the case [on grounds of forum non conveniens]").