Aldifonso Mijimaya ZACARIA

v.

**GULF KING 35, INC., Gulf King Services, Inc., and Gulf King 35, In Rem.**

No. CIV.A. G–98–490.

United States District Court, S.D. Texas, Galveston Division.

Jan. 8, 1999.

Harold Joseph Eisenman, Houston, TX, for Aldifonso Mijimaya Zacaria, plaintiff.

Richard B Waterhouse, Jr., Pipitone & Seger, Corpus Christi, Daniel Douglas Pipitone, Pipitone and Seger, Houston, TX, for Gulf King 35, Inc., Gulf King Services, Inc., Gulf King 35 In Rem, defendants.

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

This is a personal injury case arising under the Jones Act, 46 U.S.C.App. § 688 et seq. and general maritime law. Plaintiff allegedly suffered an injury on September 27, 1995 while serving aboard the M/V GULF KING 35. Now before the Court is Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment. This is the fourth time Defendants have sought to evade this Court's proper jurisdiction where substantially identical factual and legal issues concerning choice of law are present. As in *Denis v. Gulf King, 49, Inc., et al.,* Civil Action No. G–98–491, *Victor Manuel Urbina v. Gulf King 55, Inc., et al.,* Civil Action No. G–98–143, and *Solano v. Gulf King 55, Inc., et al.,* Civil Action No. G–98–095, 1998 WL 886897 (S.D.Tex. December 11, 1998), and in accordance with the reasoning set forth below, Defendants' Motion is emphatically DENIED. Indeed, in subsequent, factually similar cases, the Court will closely scrutinize any jurisdictional contest with an eye towards FED. R. CIV. P. 11 sanctions. At this point, any such contention borders on being patently frivolous.

## I. FACTUAL SUMMARY

Defendants Gulf King 35, Inc. and Gulf King Services, Inc. ("Gulf King") are Texas corporations with their principal places of business in Aransas Pass, Texas. Both businesses are closely held corporations in which members of the owning family, who are American citizens and residents of Texas, own 96 percent of the stock. Defendants own forty-three shrimping vessels, thirty-four of which operate exclusively in the waters off the shore of Nicaragua. These thirty-four vessels comprise what Defendants refer to as the "Nicaragua Fleet." Corporate officers in Defendants' Texas office make all decisions that concern the deployment or sale of any vessel in the Nicaragua Fleet. All operational and maintenance decisions regarding the fleet are made by a "fleet manager," a Nicaragua-based employee who is charged with running the fleet's day-to-day affairs but must consult with Defendants on all major decisions.[1]

The Nicaragua Fleet is the most profitable division owned by Defendants. Defendants also maintain a fleet of shrimping vessels that operates in the waters off of Texas. From 1995 to 1997, the Nicaragua Fleet generated profits of more than $1.6 million. These profits come entirely from sales in the United States of the shrimp caught in Nicaraguan waters. The shrimp are processed in Nicaragua by a Nicaraguan company called Oceanic, S.A., which receives a flat fee for its work.[2] The processed shrimp are then

---

1. Defendants have employed five different fleet managers since they began their operations in Nicaragua. Three of the fleet managers have been American citizens, while two have been Nicaraguan citizens. The current fleet manager is an American.

2. When Defendants launched their shrimping operations in Nicaragua, they entered into an agreement with Oceanic through which Oceanic would process all of the shrimp caught and assist Defendants' American ship captains and fleet managers in identifying qualified Nicaraguan seamen and processing payroll requests at the completion of each voyage. Upon receipt of the payroll requests prepared by Oceanic, Defendants would wire the requested funds to Oceanic's Nicaraguan bank account. Oceanic would

shipped to Miami, Florida, where Defendants maintain a refrigerated warehouse. From Miami, Defendants sell the shrimp exclusively to United States-based customers. The proceeds attributable to the shrimp produced by the Nicaragua Fleet end up commingled with the proceeds from Defendants' domestic operations.

Each of the vessels in the Nicaragua Fleet sails under the United States flag. According to the testimony of company officials, sailing under the U.S. flag is a condition imposed by Defendants' three primary financing creditors, the Department of Commerce, the National Marine Fishery Service, and the Small Business Administration. Together, those three government agencies have loaned Defendants approximately $23 million since 1980. The loans are secured through liens on individual ships in both the Nicaraguan and domestic fleets. To better secure their liens, the creditor agencies require that the ships sail under the U.S. flag and be documented in the United States.

The vessels are all entirely crewed by Nicaraguan citizens and captained for the most part by American citizens. The fleet manager hires a captain for each vessel, who then hires a crew for each shrimping voyage. At the conclusion of each voyage, the fleet manager faxes a payroll request based upon the particular vessel's catch to Defendants in Texas. Defendants then wire the payroll funds to a Nicaraguan bank, where the money is converted into local currency and distributed to the crew.

In this case, Plaintiff is a Nicaraguan citizen who served aboard one of the vessels in Defendants' Nicaraguan Fleet, the M/V GULF KING 35, in September 1995. On September 27 of that year, he was cutting down netting which had become entangled in the propeller of the vessel. Without any warning to Plaintiff, a wave caused the vessel to lift out of the water and Plaintiff was struck in the head by the propeller of the vessel. He suffered serious injuries including the loss of his hearing.

then pay the seamen. At the same time, Defendants agreed to purchase 50% of Oceanic's stock for the price of $1.1 million. In 1996, Defen-

## II. ANALYSIS

The issue once again confronting this Court is the choice of law governing Plaintiff's claim. The analysis is similar to that set forth in this Court's Orders in *Denis v. Gulf King, 49, Inc., et al.*, Civil Action No. G–98–491, *Victor Manuel Urbina v. Gulf King 55, Inc., et al.*, Civil Action No. G–98–143, and *Solano v. Gulf King 55, Inc., et al.*, Civil Action No. G–98–095, 1998 WL 886897 (S.D.Tex. December 11, 1998), three actions before this Court involving nearly identical facts and the same issues of law. Defendants have moved the Court to dismiss Plaintiff's cause of action for failure to state a claim for which relief may be granted. In the alternative, Defendants ask the Court to find based on the summary judgment evidence before it that Nicaraguan law governs this dispute and to dismiss all causes of action brought under the Jones Act and general maritime law under the doctrine of forum non conveniens.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable factfinder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec.*

dants assumed control over all aspects of the shrimping operations, relieving Oceanic of all duties except for processing.

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Casualty Co.,* 799 F.Supp. 691 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

The question of whether United States or foreign law applies to a maritime injury case is governed by the Supreme Court trilogy of *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); and *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). Under these cases, the following eight factors determine the choice of law: (1) the allegiance or domicile of the plaintiff; (2) the place of the contract; (3) the allegiance of the defendant shipowner; (4) the law of the flag; (5) the accessibility of the foreign forum; (6) the place of the wrongful act; (7) the law of the forum; and (8) the defendant shipowner's base of operations. These factors, while potentially suggestive of a mechanical approach to determining choice of law, are not all of equal or even comparable significance. *See Rhoditis,* 398 U.S. at 308–09, 90 S.Ct. at 1733–34; *Schexnider v. McDermott International, Inc.,* 817 F.2d 1159, 1161 (5th Cir.1987); *Munusamy v. McClelland Engineers, Inc.,* 579 F.Supp. 149, 152–53 (E.D.Tex.1984). Generally, the law of the flag and the defendant shipowner's base of operations weigh most heavily in the determination. *See Lauritzen,* 345 U.S. at 583, 73 S.Ct. at 929 (stating that the law of the flag is of "cardinal importance" in determining applicable law); *Rhoditis,* 398 U.S. at 309–10, 90 S.Ct. at 1734–35 (holding that the defendant's New York base of operations favored United States law despite the ship's Greek flag). On the other hand, the place of the wrongful act, the inaccessibility of a foreign forum, and the law of the forum are seldom relevant to the determination. *See Sablic v. Armada Shipping Aps,* 973 F.Supp. 745, 750–51 (S.D.Tex.1997) (citing *Lauritzen,*

345 U.S. at 583, 73 S.Ct. at 929) (stating that the place of the wrongful act carries little weight in shipboard torts because of the numerous jurisdictions through which vessels typically pass); *Munusamy,* 579 F.Supp. at 153 (noting that inaccessibility of a foreign forum and the law of the forum are irrelevant). Moreover, each of the factors may be substantial in one context but insignificant in another. *See Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015, 1018 (5th Cir.1981). The national interests to be served by application of United States law may also influence the weight to be assigned each factor. *See Schexnider,* 817 F.2d at 1161 (citing *Rhoditis,* 398 U.S. at 308–09, 90 S.Ct. at 1733–34).

In the present case, the law of the flag is undisputedly that of the United States. The M/V Gulf King 35 was flying the U.S. flag at the time of the accident. Defendants were required to sail under the U.S. flag as a condition of the loans the received from three government agencies. While each of the vessels in the Nicaragua Fleet flew a Nicaraguan flag as well, Plaintiff has offered testimony from a corporate officer that those flags merely served as an indication that the vessels were authorized to fish in Nicaraguan territorial waters. The flag was not a sign of Nicaraguan ownership or registration. The law of the flag clearly favors application of American law.

Defendants argue that the second key factor in a choice of law analysis, the base of operations of the vessel, is Nicaragua. However, as this Court has previously noted, the summary judgment evidence overwhelmingly demonstrates that Defendants' real base of operations is the United States. While it is not irrelevant that M/V 35 is permanently stationed in Nicaragua and plies its trade in Nicaraguan waters, this Court is instructed to look beyond the "facade of the operation" to the "actual operational contacts that this ship and this owner have with the United States." *Rhoditis,* 398 U.S. at 310, 90 S.Ct. at 1734–35. Here a cold objective look leads to the inescapable conclusion that the center of control of Defendants' operations is Defendants' headquarters in Aransas Pass, Texas.

First, the fleet manager must consult with Defendants on all major decisions, and Defendants make all decisions concerning the deployment or sale of a particular vessel at their Texas headquarters. Second, Defendants reap their profits on all shrimp caught in Nicaragua by selling them in the United States, and sale proceeds of the domestic and Nicaraguan shipping operations are commingled. Finally, the vessel is entirely owned by Defendants, a pair of closely held Delaware corporations which have Texas as their principal place of business; one Texas family holds 96 percent of the stock of these corporations. Although day-to-day operations are the touchstone for the base of operations analysis in this Circuit, see *Bailey*, 697 F.2d at 1275 n. 22, the fact that the fleet manager required corporate approval for any major day-to-day decisions mitigates against concluding that Nicaragua was Defendants' base. The vast extent of Defendants' U.S. contacts leads to the inescapable conclusion that the base of operations is the Unites States and this factor therefore favors application of U.S. law.

Similarly, the allegiance of Defendants supports application of American law. Defendants are two Delaware corporations who operate principally from their corporate headquarters in Texas. In addition, their stock is almost entirely controlled by two members of the owning family.

Only two factors favor application of Nicaraguan law. First, Plaintiff is a Nicaraguan citizen who maintains his residence in that country. Second, the place of the employment contract entered into between Plaintiff and Defendants was Nicaragua. The remaining factors—the place of the alleged wrong, the accessibility of Nicaragua as a forum, and the law of this forum—are not relevant to the determination.

In light of Defendants' overwhelming ties with the Unites States, the Court is extremely troubled by Defendants' attempts to escape the liability imposed by United States law. Such action approaches fraud upon American taxpayers whose tax dollars to the tune of $23 million, in the form of loans secured through the United States Department of Commerce, Small Business Adminis-

tration, and the National Marine Fishery Service, provide the primary financing mechanism for Defendants' operations, thus keeping Defendants' operations afloat. To protect that investment, the lending agencies require that the Nicaragua Fleet fly the American flag. This provides Defendants and their assets with the extensive protections that the United States government and its laws afford American citizens and businesses abroad. As one of Defendants' officers testified, United States registration protects the vessels of the Nicaragua Fleet in the event that the Nicaraguan government tries to nationalize any of them, as it had done with other shrimping vessels during periods of political instability. Thus this Court is presented with the astonishingly arrogant assertion that Defendants would readily seek the benefits of American financial assistance, and the shelter provided by American laws and the United States Government should they find their assets threatened, yet they wish to evade the protections American law provides to their very own crewmembers. They ask American taxpayers to fund a shrimping operation that places its profits into the pockets of a few affluent Texans, that competes with United States businesses, and that results in jobs lost to American citizens, yet they wish to be held unaccountable for their misconduct under American law. It cannot be doubted that Defendants profits are largely attributable to the wage savings resulting from the employment of Nicaraguans rather than Americans. Profits are likely also attributable to reduced maintenance and repair outlays for the Nicaragua fleet as the incentive to maintain the Nicaragua Fleet to comply with U.S. regulations is minimal because Defendants have located their fleet outside the immediate reach of the U.S. Coast Guard. In fact, since transferring the vessels that now comprise the Nicaragua fleet to Nicaragua, those vessels have not been subject to one single safety inspection despite the U.S. registration and documentation of those ships. The American fleet, by contrast, is annually and periodically inspected. This sort of conduct is the worst example of American jingoism which has created so many problems over the last century between the United States

and its fellow countries in Latin America. Fortunately, the law provides this Court with an opportunity to hold these Defendants accountable under American law for their actions and to provide them with an incentive to provide safe working conditions for their employees. Even if the Department of Commerce, the Small Business Administration, the National Marine Fishery Service, and the Coast Guard choose to turn a blind eye to Defendants' atrocious conduct, this Court has no intention of doing so. The Court firmly concludes that these Texas Defendants must answer for their conduct under the Jones Act and general maritime law. Consequently, Defendants' Motion for Dismissal, and, in the alternative, Summary Judgment is therefore emphatically **DENIED.**

## III. CONCLUSION

The Court finds as a matter of law that the Jones Act and the general maritime law of the United States governs Plaintiff's claim. Because United States law governs Plaintiff's claim, the Court need not consider Defendants' arguments in favor of forum non conveniens dismissal. *See Schexnider,* 817 F.2d at 1161 ("First the court determines that United States law does not apply, and then the court balances public and private convenience factors set forth in judicial precedent to determine whether to dismiss the case [on grounds of forum non conveniens]"). This case will be set for trial at a later date.

For the reasons set forth above, Defendants' Motion to Dismiss for Failure to State a Claim or, in the alternative, for Summary Judgment is **DENIED.** The parties are **ORDERED** to bear their own taxable costs and expenses incurred herein to date.

**IT IS SO ORDERED.**