Raymundo Cerrato **SOLANO**

v.

**GULF KING 55, INC., Gulf King Services, Inc., and Gulf King 55, in Rem**

**No. CIV. A. G–98–095.**

United States District Court, S.D. Texas, Galveston Division.

July 19, 1999.

---

Harold Joseph Eisenman, Attorney at Law, Houston, TX, Richard Lee Melancon, Melancon and Hogue, Friendswood, TX, Walter Z. Steinman, Attorney at Law, Wyncote, PA, for Raymundo Cerrato Solano, plaintiff.

Richard B. Waterhouse, Jr, Pipitone & Seger, Daniel Douglas Pipitone, Pipitone and Seger, Corpus Christi, TX, for Gulf King 55, Inc., Gulf King Services, Inc., Gulf King 55 in Rem, defendants.

Ronald L White, Brown Sims Wise & White, Houston, for Ron White, movants.

### ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

This is a personal injury case arising under the Jones Act, 46 U.S.C.App. § 688 *et seq.* and general maritime law. Plaintiff allegedly suffered an injury on February 23, 1995 while serving aboard the M/V GULF KING 55. He filed this claim against Defendants on February 19, 1998. Now before the Court are Motions for Summary Judgment from Defendants Gulf King 55, Inc., and Gulf King Services, Inc. For the reasons set forth below, Defendants' Motions are DENIED.

### I. FACTUAL SUMMARY

Defendants Gulf King 55, Inc. And Gulf King Services, Inc. ("Gulf King") are Texas corporations with their principal places of business in Aransas Pass, Texas. Both businesses are closely held corporations in which members of the owning family, who are American citizens and residents of Texas, own 96 percent of the stock. Defendants own forty-three shrimping vessels, thirty-four of which operate exclusively in the waters off the shore of Nicaragua. Together, these thirty-four vessels comprise what Defendants refer to as the "Nicaragua Fleet." Corporate officers in Defendants' Texas office make all decisions that concern the deployment or sale of any vessel in the Nicaragua Fleet. All operational and maintenance decisions regarding the fleet are made by a "fleet manager," a Nicaragua-based employee who is charged with running the fleet's day-to-day affairs but must consult with Defendants on all major decisions.[1]

The Nicaragua Fleet is the most profitable division owned by Defendants, which also maintain a fleet of shrimping vessels that operates in the waters off of Texas.

---

1. Defendants have employed five different fleet managers since they began their operations in Nicaragua. Three of the fleet managers have been American citizens, while two have been Nicaraguan citizens. The current fleet manager is an American.

From 1995 to 1997, the Nicaragua Fleet has generated profits of more than $1.6 million. These profits come entirely from sales in the United States of the shrimp caught in Nicaraguan waters. The shrimp are processed in Nicaragua by a Nicaraguan company called Oceanic, S.A., which receives a flat fee for its work.[2] The processed shrimp are then shipped to Miami, Florida, where Defendants maintain a refrigerated warehouse. From Miami, Defendants sell the shrimp exclusively to United States-based customers. The proceeds attributable to the shrimp produced by the Nicaragua Fleet end up commingled with the proceeds from Defendants' domestic operations.

Each of the vessels in the Nicaragua Fleet sails under the United States flag. According to the testimony of company officials, sailing under the U.S. flag is a condition imposed by Defendants' three primary financing creditors, the United States Department of Commerce, the National Marine Fishery Service, and the Small Business Administration. Together, those three government agencies have loaned Defendants approximately $2.3 million since 1980. The loans are secured through liens on individual ships in both the Nicaraguan and domestic fleets. To better secure their liens, the creditor agencies require that the ships sail under the U.S. flag and be documented in the United States.

The vessels are all entirely crewed by Nicaraguan citizens and captained for the most part by American citizens. The fleet manager hires a captain for each vessel, who then hires a crew for each shrimping voyage. At the conclusion of each voyage, the fleet manager faxes a payroll request based upon the particular vessel's catch to Defendants in Texas. Defendants then wire the payroll funds to a Nicaraguan bank, where the money is converted into local currency and distributed to the crew.

In this case, Plaintiff is a Nicaraguan citizen who served aboard one of the vessels in Defendants' Nicaraguan Fleet, the M/V GULF KING 55, in February 1995. On February 23 of that year, he was assisting with a line that is used to raise the shrimping nets when the winch controlling the line allegedly reversed itself and sent the line paying out rapidly in the opposite direction. Plaintiff's hand was caught in the line and severely injured. He filed suit against Defendants in this Court on February 19, 1998.

## II.ANALYSIS

The issue confronting this Court is the choice of law governing Plaintiff's claim. Plaintiff alleges claims under the Jones Act, 46 U.S.C.App. § 688 *et seq.*, and the general maritime law. Defendants argue that Nicaraguan law governs this dispute and asks the Court to dismiss all causes of action brought under the Jones Act and general maritime law.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of

**2.** When Defendants launched their shrimping operations in Nicaragua, they entered into an agreement with Oceanic through which Oceanic would process all of the shrimp caught and assist Defendants' American ship captains and fleet managers in identifying qualified Nicaraguan seamen and processing payroll requests at the completion of each voyage. Upon receipt of the payroll requests prepared by Oceanic, Defendants would wire the requested funds to Oceanic's Nicaraguan bank account. Oceanic would then pay the seamen. At the same time, Defendants agreed to purchase 50% of Oceanic's stock for the price of $1.1 million. In 1996, Defendants assumed control over all aspects of the shrimping operations, relieving Oceanic of all duties except for processing.

material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere *existence* of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Casualty Co.,* 799 F.Supp. 691 (S.D.Tex.1992)(noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

■ The question of whether United States or foreign law applies to a maritime injury case is governed by the Supreme Court trilogy of *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); and *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). Under these cases, the following eight factors determine the choice of law: (1) the allegiance or domicile of the plaintiff; (2) the place of the contract; (3) the allegiance of the defendant shipowner; (4) the law of the flag; (5) the accessibility of the foreign forum; (6) the place of the wrongful act; (7) the law of the forum; and (8) the defendant shipowner's base of operations. These factors, while potentially suggestive of a mechanical approach to determining choice of law, are not all of equal or even comparable significance. *See Rhoditis,* 398 U.S.

at 308–09, 90 S.Ct. at 1733–34; *Schexnider v. McDermott International, Inc.,* 817 F.2d 1159, 1161 (5th Cir.1987); *Munusamy v. McClelland Engineers, Inc.,* 579 F.Supp. 149, 152–53 (E.D.Tex.1984). Generally, the law of the flag and the defendant shipowner's base of operations weigh most heavily in the determination. *See Lauritzen,* 345 U.S. at 583, 73 S.Ct. at 929 (stating that the law of the flag is of "cardinal importance" in determining applicable law); *Rhoditis,* 398 U.S. at 309–10, 90 S.Ct. at 1734–35 (holding that the defendant's New York base of operations favored United States law despite the ship's Greek flag). On the other hand, the place of the wrongful act, the inaccessibility of a foreign forum, and the law of the forum are seldom relevant to the determination. *See Sablic v. Armada Shipping Aps,* 973 F.Supp. 745, 750–51 (S.D.Tex. 1997) (*citing Lauritzen,* 345 U.S. at 583, 73 S.Ct. at 928) (stating that the place of the wrongful act carries little weight in shipboard torts because of the numerous jurisdictions through which vessels typically pass); *Munusamy,* 579 F.Supp. at 153 (noting that inaccessibility of a foreign forum and the law of the forum are irrelevant). Moreover, each of the factors may be substantial in one context but insignificant in another. *See Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015, 1018 (5th Cir.1981). The national interests to be served by application of United States law may also influence the weight to be assigned each factor. *See Schexnider,* 817 F.2d at 1161 (*citing Rhoditis,* 398 U.S. at 308–09, 90 S.Ct. at 1733–34).

Before the Court can analyze the *Lauritzen* factors, however, it must address two separate but related arguments offered by Defendants: first, that Nicaragua has exclusive sovereignty over the incidents forming the basis of Plaintiff's claim and that application of United States law to this action would violate "accepted principles of international comity," and second, that application of United States law would conflict with the policy of "mutual forbearance" as suggested by the Supreme Court

in *Lauritzen,* 345 U.S. at 582, 73 S.Ct. at 928.

Defendants argue that the incidents forming the basis of this action occurred within Nicaragua's territorial waters, giving Nicaragua exclusive sovereignty over them, and that as a consequence any application of American law would be illegitimate. In support of this position, Defendants cite *Lauritzen,* arguing that the Supreme Court stated unequivocally in that decision that American law can never be extended beyond "internationally accepted rules of sovereignty and jurisdiction." In fact, the Supreme Court did emphasize that in applying the Jones Act, courts must not construe it in such a way " 'to violate the law of nations if any other possible construction remains ....' " *See id.* at 578, 73 S.Ct. at 926 (*quoting Charming Betsy,* 2 Cranch 64, 2 L.Ed. 208). Yet to ascribe to that passage the meaning for which Defendants argue would ignore the substance of *Lauritzen.* Contrary to Defendants' argument that such considerations must be addressed before it becomes necessary to apply the *Lauritzen* choice of law factors, those considerations merely comprise a part of the policy which analysis of the *Lauritzen* factors ultimately must serve. In other words, the factors articulated by the *Lauritzen* Court are themselves intended to answer the question of whether application of American law would comport with accepted principles of international law. *See id.* at 582–83, 73 S.Ct. at 928 (stating that courts must balance the interests of competing laws through the "weighing of the significance of one or more connecting factors between the shipping transaction regulated and the national interest served by the assertion of authority"). To interpret *Lauritzen* otherwise, as Defendants would have this Court do, would require substantial historical revision of the facts underlying that case; there, the plaintiff was injured while his vessel was in Havana Harbor, *see id.* at 573, 73 S.Ct. at 923, surely as much a part of Cuba's territorial waters as the shallow waters in which Defendants' vessels fish are a part of Nicaragua's.

Second, Defendants argue that application of American law would conflict with the policy of "mutual forbearance" as suggested by the *Lauritzen* Court and that as a consequence this Court must forego any such application of American law. To the extent that this argument is anything more than a rephrasing of Defendant's first argument, it fares little better under scrutiny than the first. The *Lauritzen* Court was doubtless concerned with the possibility of retaliation should American courts extend this country's law too far. *See id.* at 582, 73 S.Ct. at 928. Read in the context of the entire decision, however, this concern too is reflected in the balancing test the *Lauritzen* Court articulated. *See id.* at 582–83, 73 S.Ct. at 928.

Defendants' initial arguments thus addressed, the Court now turns to a reexamination of the *Lauritzen* factors in this case. In its previous order denying Defendants' Motion for Summary Judgment, the Court concluded that the law of the flag and Defendants' base of operations combined to make American law applicable. *See Solano v. Gulf King 55, et al.,* 30 F.Supp.2d 960, 964 (1998). However, Defendants' more recent Motion raises several interesting arguments. Defendants' counsel has done a superb job in presenting those arguments, performing, not surprisingly, to the high standard the Court has come to expect in his work. The Court will address each of his arguments in turn.

The Court first looks to the law of the flag. *See Lauritzen,* 345 U.S. at 583, 73 S.Ct. at 929 (emphasizing the "cardinal importance" of the law of the flag). This factor would seem to clearly favor the application of American law, as the GULF KING 55, like all of Defendants' vessels, flies the American flag. However, Defendants make a forceful argument that the Court placed undue emphasis on this fac-

tor in its earlier decision. In circumstances not involving "traditional" maritime activities, where vessels may cross through waters of numerous nations, but rather involving activities largely confined to the territory of one nation, lower federal courts have placed less weight on the law of the flag, Defendants argue. In fact, Defendants cite several cases for the proposition that in situations where a vessel is permanently stationed in one jurisdiction, the law of the flag takes on less significance than the place of the alleged wrong. *See Fogleman v. ARAMCO,* 920 F.2d 278, 282 (5th Cir.1991) (stating that the place of the wrongful act assumes greater importance in cases where "the injury stems from work on a permanently situated offshore oil rig or work platform" than in traditional maritime cases); *Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015, 1018–19 (5th Cir.1981) (stating in a case involving a permanently fixed drilling platform stationed off the coast of Nigeria that certain factors may be less important than they would be in other circumstances); *Cuevas v. Reading & Bates Corp.,* 577 F.Supp. 462, 465 (S.D.Tex.1983) ("[B]ecause of the differences between a mobile and stationary vessel or rig the importance of the [law of the flag] is much less in this case than it was in *Lauritzen.*"). Defendants' reliance on those opinions for the proposition that the place of the alleged wrong assumes greater importance than the law of the flag in cases such as this one is misleading; none of those opinions states or even implies that. Regardless, the Court is convinced it placed appropriate weight on the law of the flag in its previous opinion. Defendants were required to sail under the U.S. flag as a condition of the more than $2.3 million in loans they had received from three government agencies, the United States Department of Commerce, the National Marine Fishery Service, and the Small Business Administration. In addition, Defendants themselves benefited by flying the U.S. flag. As one officer testified, U.S. registration would have protected the vessels of the Nicaragua Fleet in the event that the Nicaraguan government had tried to nationalize any of them, as it had done with other shrimping vessels during periods of political instability. While each of these vessels in the Nicaragua Fleet flew a Nicaraguan flag as well, Plaintiff has offered testimony from a corporate officer that those flags merely served as an indication that the vessels were authorized to fish in Nicaraguan territorial waters. The flag was not a sign of Nicaraguan ownership or registration. Defendants profited immensely in several ways from their association with the United States flag; to deemphasize its importance in this analysis would be inappropriate.

The next most crucial factor is the base of operations. *See Rhoditis,* 398 U.S. at 310, 90 S.Ct. at 1734. In its previous order, this Court concluded that the overwhelmingly American flavor of Defendant's Nicaragua operation suggested that the base-of-operations factor favored the application of American law. *See Solano,* 30 F.Supp.2d at 963. Although the vessel's day-to-day operations fell under the supervision of its captains and the Nicaragua-based fleet manager, numerous connections link the entire Nicaragua Fleet to Defendants' headquarters in Aransas Pass, Texas. First, the fleet manager must consult with Defendants on all major decisions, and Defendants make all decisions concerning the deployment or sale of a particular vessel at their Texas headquarters. Second, all shrimp caught by these vessels are shipped to Miami for sale in the United States, the proceeds of which are commingled with those from the sales traceable to Defendants' domestic operations. Finally, the vessel is entirely owned by Defendants, a pair of closely held Delaware corporations which have Texas as their principal place of business. One Texas family holds 96 percent of the stock of these corporations. The totality of those circumstances led the Court to conclude that Defendants' true base of operations is in the United States. *See id.* However,

Defendants remind the Court that day-to-day operations are the touchstone for the base of operations analysis in this Circuit, *see Bailey,* 697 F.2d at 1275; *Vaz Borralho v. Keydril Co.,* 696 F.2d 379, 389 (5th Cir.1983). The location from which a vessel's day-to-day operations are controlled is considered the base of operations for a defendant, even where the defendant is a wholly owned subsidiary of an American corporation. *See Fogleman,* 920 F.2d at 284. As the majority of the day-to-day decisions concerning the GULF KING 55 and the other vessels in the Nicaragua fleet are made in Nicaragua, the Court concludes that the base-of-operations factor favors the application of Nicaraguan law.

Three other factors favor application of Nicaraguan law. First, Plaintiff is a Nicaraguan citizen who maintains his residence in that country. Second, the place of the employment contract entered into between Plaintiff and Defendants was Nicaragua. Third, the alleged wrong occurred in the territorial waters of Nicaragua. While the place of the alleged wrong is given little weight in "traditional" maritime cases, *see id.* at 282 (*citing Lauritzen,* 345 U.S. at 583–84, 73 S.Ct. at 929; *Quintero v. Klaveness Ship Lines,* 914 F.2d 717, 722 (5th Cir.1990)), the Court agrees with Defendants that this factor merits some consideration given the nature of Defendants' work, which during recent years has taken place exclusively in Nicaraguan territorial waters.

On the other hand, the allegiance of Defendants supports application of American law. Defendants are two Delaware corporations who operate principally from their corporate headquarters in Texas. In addition, their stock is almost entirely controlled by two members of the owning family. The remaining factors—the accessibility of Nicaragua as a forum, and the law of this forum—are not relevant to the determination.

The factors governing choice of law thus appear to be closely divided, with the two factors traditionally considered the most important—choice of law and base of operations—each favoring opposition conclusions. To animate its analysis of the factors, then, the Court must consider the national interests to be served by the choice of American law. *See Schexnider,* 817 F.2d at 1161 (*citing Rhoditis,* 398 U.S. at 308–09, 90 S.Ct. at 1733–34); *Castillo v. Santa Fe Shipping Corp.,* 827 F.Supp. 1269, 1271 (S.D.Tex.1992).

To this end, Defendants urge the Court to consider the interests of American companies competing in the international marketplace. Presumably, Defendants are such a company and the Court can best serve such interests by finding that Nicaraguan law applies. This argument the Court finds patently ludicrous. First, Defendants do not suggest precisely how such a finding would enable companies such as theirs to compete internationally. If their point is that application of Nicaraguan law would reduce Defendants' costs whenever one of their employees is injured on the job, thus making them more competitive, the Court responds that such an effect is not its primary concern. Second, Defendants fail to mention just what foreign market they are competing in. Defendants are shrimpers. They sell their shrimp exclusively to American customers. That means they are competing in a domestic market. The Court is therefore unconvinced that applying Nicaraguan law in this case would serve the interest of American companies competing internationally.

On the other hand, the application of American law could well serve at least one American interest, as the Court noted in its previous opinion. Defendants, who are incorporated under American laws and receive substantial benefit therefrom, are responsible for the expatriation of a significant number of American jobs. Defendants are two profitable companies that derive most of their profits from their Nicaraguan operation. This is in part because Defendants realize a substantial

savings due to the lower wages received by the Nicaraguan seamen they employ. The Court has little doubt that any potential recovery to which these Plaintiffs may be entitled in Nicaragua would be significantly lower than that they might receive under the Jones Act. Humane considerations aside, the Court does not need to provide further incentive for corporations like these Defendants to employ foreign nationals in their fishing operations to the exclusion of higher-paid American seamen. Defendants have already received the benefit of their bargain in the form of lower wage obligations and the resulting greater profits; allowing them to escape the obligations of the Jones Act while maintaining such extensive control over the operation of the Nicaragua Fleet vessels such as M/V GULF KING 55 would be a windfall. In addition, the Court notes that Plaintiff and the other Nicaraguan seamen who are employed by Defendants confer a greater economic benefit upon Defendants than do the American seamen Defendants employ in domestic waters. This only underscores the dictate that the control exercised by Defendants over these foreign seamen confers a correlative duty upon them to make commensurate provisions for their welfare. It is conceivably within the national interest that this country's corporations not be seen by foreign governments as ruthless exploiters of their countries' labor pools. It is certainly within the national interest that the United States government, which has propped up Defendants with more than $2 million in loans, not be perceived as officially or implicitly sanctioning such conduct.

Accordingly, the Court concludes based on an analysis of the choice of law factors and the national interests at issue that American law governs this action. Defendants' Motions for Summary Judgment are each **DENIED.**

### III. CONCLUSION

For the reasons set forth above, Defendants' Motions for Summary Judgment are **DENIED.** The parties are **ORDERED** to bear their own taxable costs and expenses incurred herein to date.

**IT IS SO ORDERED.**