

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-22-2000

# Calhoun v. Yamaha Motor Corp

Precedential or Non-Precedential:

Docket 99-1378

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Calhoun v. Yamaha Motor Corp" (2000). *2000 Decisions.* Paper 136.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/136

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 23, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1378

LUCIEN B. CALHOUN;
ROBIN L. CALHOUN,
individually and as Administrators
of the Estate of Natalie K. Calhoun, deceased

v.

*YAMAHA MOTOR CORPORATION, U.S.A.;
YAMAHA MOTOR CO., LTD.;

       Lucien B. Calhoun;
       Robin L. Calhoun,

       Appellants

(*Amended as per the Clerk's 6/1/99 Order)

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 90-cv-04295)
District Judge: Honorable Louis H. Pollak

Argued Thursday, November 4, 1999

BEFORE: NYGAARD and McKEE, Circuit Judges;
and GARTH, Senior Circuit Judge.

(Opinion filed: June 23, 2000)

William J. Taylor (Argued)
William A. DeStefano
Patrick J. Wolfe, Jr.
Saul, Ewing, Remick & Saul
3800 Centre Square West
1500 Market Street
Philadelphia, PA 19102

Attorneys for Appellants

Jonathan Dryer (Argued)
Wilson, Elser, Moskowitz
Edelman & Dicker LLP
The Curtis Center - Suite 1130 East
Independence Square West
Philadelphia, PA 19106

Attorneys for Appellees

OPINION OF THE COURT

GARTH, Circuit Judge:

Admiralty law is considered one of the most complex areas of American law. See 1 Thomas J. Schoenbaum, Admiralty & Maritime Law, S 1-1, at 2 (2d ed. 1994). In an earlier appeal in this matter, the United States Supreme Court held that Lucien and Robin Calhoun ("the Calhouns") may assert a cause of action based upon a state wrongful death or survival statute to obtain relief for the death of a non-seaman killed in United States territorial waters. See Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 216 (1996). We are now asked to resolve some of the problems arising from the Supreme Court's holding -- problems that the Court itself recognized -- by ruling upon two distinct questions that the Court expressly declined to decide.

In particular, we must determine (1) which state's law governs the type of damages available, and (2) whether state or federal law governs the standards by which the liability of appellees Yamaha Motor Corporation, U.S.A. and Yamaha Motor Company, Ltd. will be defined. As a result, this appeal concerns the extent to which state law may co-

2

exist in the admiralty arena that historically has been the exclusive domain of federal legislative and regulatory entities. See generally David R. Lapp, Note, Admiralty & Federalism in the Wake of Yamaha Motor Corp. U.S.A. v. Calhoun: Is Yamaha a Cry by the Judiciary for Legislative Action in State Territorial Waters?, 41 Wm. & Mary L. Rev. 677 (2000).

With regard to damages, the District Court for the Eastern District of Pennsylvania held that the law of Pennsylvania would govern the issue of compensatory damages and that the law of Puerto Rico would govern that of punitive damages. The District Court further held that the law of Puerto Rico would govern the issue of Yamaha's liability. We will affirm in part and reverse in part, affirming the District Court's holding with respect to damages (both compensatory and punitive), yet reversing the District Court's disposition concerning liability, holding instead that federal maritime law must govern the standards by which Yamaha's liability will be evaluated.

I

In July 1989, Natalie Calhoun ("Natalie"), then twelve years old, traveled to Puerto Rico with her parents' permission to vacation with a friend and that friend's family. Tragically, however, on July 6, 1989, Natalie died when the Yamaha1 "WaveJammer"2 she was operating in the water bordering the resort at which she was staying struck an anchored vessel. The Calhouns, as Pennsylvania

_____

1. We will refer to both Yamaha entities that are the subject of this action collectively as "Yamaha." Yamaha Motor Company, Ltd. is the manufacturing arm of the corporation, and is both incorporated and has its principal place of business in Japan. Yamaha Motor Corporation, U.S.A., is the distributing arm of the corporation, and is both incorporated and has its principal place of business in California.

2. Although Yamaha apparently no longer manufactures the "WaveJammer," both this Court and the Supreme Court previously have described the vehicle as a class of jet ski. See Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 202 (1996); Calhoun v. Yahama Motor Corp., U.S.A., 40 F.3d 622, 624 (3d Cir. 1994). At oral argument, counsel for the Calhouns referred to the WaveJammer as a"watertoy."

3

residents, filed the present action against Yamaha on June 27, 1990, seeking relief pursuant to the Pennsylvania wrongful death and survival statutes, 42 Pa. Cons. Stat. Ann. SS 8301-8302 (West 1995). The Calhouns' complaint, which alleged defects in the WaveJammer, is grounded in theories of strict liability, negligence, and breach of implied warranties of merchantability and fitness for a particular purpose. The complaint seeks both compensatory and punitive damages. Because the law of Puerto Rico does not allow a plaintiff to recover punitive damages, the Calhouns asserted that all questions concerning the appropriate form of remedy be governed by the law of Pennsylvania. For the same reason, on the other hand, Yamaha argued for the application of the law of Puerto Rico for resolution of all damages issues.

Yamaha filed a motion for partial summary judgment on November 27, 1991, alleging that because Natalie died in United States territorial waters,[3] federal maritime law provided the Calhouns' sole remedy for the circumstances surrounding Natalie's death.[4] The District Court granted Yamaha's motion in part, and dismissed that portion of the Calhouns' complaint that sought punitive damages and the loss of future earnings. See Calhoun v. Yamaha Motor Corp., U.S.A., No. CIV. A. 90-4295, 1993 WL 216238, at *12 (E.D. Pa. June 22, 1993). After the Calhouns took an interlocutory appeal, we affirmed in part and reversed in part. See Calhoun v. Yahama Motor Corp., U.S.A. , 40 F.3d

_____

3. The term "territorial waters" refers to"all inland waters, all waters between line of mean high tide and line of ordinary law water, and all waters seaward to a line three geographical miles distant from the coast line." Black's Law Dictionary 1473 (6th ed. 1990); see also Calhoun, 40 F.3d at 624 (quoting William C. Brown, III, Problems Arising from the Intersection of Traditional Maritime Law and Aviation Death and Personal Injury Liability, 68 Tul. L. Rev. 577, 581 (1994)). The parties do not dispute that Natalie's death occurred in the territorial waters surrounding the Commonwealth of Puerto Rico.

4. As we discuss infra, the Calhouns opposed the application of federal maritime law to the substantive liability issues presented in the litigation
because as opposed to the law of Pennsylvania, federal maritime law would allow Yamaha to introduce evidence of Natalie's negligence. See infra n.16.

4

622 (3d Cir. 1994). We concluded that although the Supreme Court, in Moragne v. States Marine Lines, Inc., 398 U.S. 375 (1970), had eliminated the use of state law causes of action for deaths of seamen in territorial waters, state causes of action still remained available as relief for the death of non-seamen in territorial waters. The Supreme Court granted certiorari, see Yamaha Motor Corp., U.S.A. v. Calhoun, 514 U.S. 1126 (1995), and affirmed in an unanimous opinion. See Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199 (1996).

Neither the original panel of this Court nor the Supreme Court, however, answered the questions that emerged from their respective holdings. See Yamaha, 516 U.S. at 216 n.14; Calhoun, 40 F.3d at 644-45. First , if the Calhouns could utilize Pennsylvania's wrongful death or survival statute to obtain relief for Natalie's death, which law[5] -- Pennsylvania's or Puerto Rico's -- governs the form of the remedy (or remedies) available to the Calhouns? Second, even understanding that Pennsylvania's wrongful death or survival statute provides the vehicle through which this action may proceed, does federal maritime law or state law provide the standards by which Yamaha's substantive liability will be determined? If the answer to this latter question is state law, will such liability standards be derived from the law of Pennsylvania or Puerto Rico?

On remand from the Supreme Court, the District Court issued a preliminary ruling on the first of these questions during a hearing held on September 23, 1998, a ruling that the District Court finalized in an opinion and order filed on March 22, 1999. See Calhoun v. Yamaha Motor Corp., U.S.A., 40 F. Supp. 2d 288 (E.D. Pa. 1999). Specifically, the District Court held that because the present action"sounds in admiralty," federal choice-of-law rules[6] would be employed to determine whether Pennsylvania or Puerto

_____

5. Although Puerto Rico is technically classified as a "commonwealth" and not a "state," we, as did the District Court, will use the term "state law" to describe the law of both Pennsylvania and Puerto Rico.

6. As we discuss in detail infra, federal choice-of-law analysis in the admiralty arena is governed by the Supreme Court's opinion in Lauritzen v. Larsen, 345 U.S. 571 (1953). See infra  Part III-B.

Rico's law on damages would govern the present action. Invoking the doctrine of depecage,[7] the District Court held that Pennsylvania law would govern the Calhouns' claim for compensatory damages and the law of Puerto Rico would govern their claim for punitive damages. Insofar as the law of Puerto Rico did not provide for the recovery of punitive damages, the District Court granted partial summary judgment in favor of Yamaha and dismissed that portion of the Calhouns' complaint that sought punitive damages. As for the second issue, the District Court determined that state law would govern the standards of liability, and, more specifically, that the law of Puerto Rico would be the source of such standards.

The District Court again certified these issues to this Court through an interlocutory order pursuant to 28 U.S.C. S 1292(b). On April 12, 1999, we permitted the Calhouns to take this appeal.

II

The District Court's order requires us to address and answer three different questions:

> 1. Did [the District Court] err in deciding, on remand, that partial summary judgment should be granted to Yamaha, precluding any claim by the Calhouns for punitive damages, on the ground that (a) the availability of punitive damages should be determined by the remedial law of Puerto Rico, the situs of the tragic accident giving rise to the suit, and (b) the law of remedies of Puerto Rico makes no provision for punitive damages?

> 2. Did [the District Court] err in deciding, on remand, that the Calhouns' entitlement to seek particular categories of compensatory damages should be determined by the law of remedies of Pennsylvania, the state of residence of Lucien and Robin Calhoun and of their daughter Natalie, rather than by the law of

_____

7. "Depecage" refers to the use of the law of different states to resolve different issues in the same case. See, e.g., Ruiz v. Blentech Corp., 89 F.3d 320, 325 (7th Cir. 1996).

remedies of Puerto Rico, the situs of Natalie's fatal accident, and hence that Yamaha's motion for partial summary judgment should be denied insofar as it sought to preclude the Calhouns from seeking compensatory damages in conformity with the law of remedies of Pennsylvania?

3. Did [the District Court] err in deciding, on remand, that the jurisdiction whose substantive liability law is the source of the Calhouns' claims is Puerto Rico?

Calhoun, 40 F. Supp. 2d at 295-96.

III

We turn first to the questions concerning damages. In issuing its ruling, the District Court reached three separate conclusions: (1) because the action instituted by the Calhouns concerned a death occurring in the "navigable waters" of the United States, the action "sound[ed] in admiralty," and therefore implicated federal choice-of-law rules; (2) given the differing (yet significant) interests of both Pennsylvania and Puerto Rico in the proper mode of recovery in this matter, the use of the depecage doctrine was appropriate; and (3) because Pennsylvania has a stronger interest in providing compensation for its citizens, Pennsylvania's law would govern as to compensatory damages, and because Puerto Rico has a stronger interest in punishing Yamaha for tortious acts occurring in its territorial waters, Puerto Rico's law would govern on punitive damages. The significance of the District Court's punitive damage ruling is that the law of Puerto Rico does not allow for the recovery of punitive damages in a wrongful death or survival action.[8]

_____

8. The District Court's interlocutory order also inquires if it erred with respect to its more substantive holding that law of Puerto Rico would not provide the Calhouns with the opportunity for punitive damages on the facts presented in their complaint. We hold that the District Court did not err, and therefore answer this portion of the interlocutory order in the negative. See, e.g., Barreto v. Citibank, N.A., 907 F.2d 15, 15 (1st Cir.
1990); Shelley v. Trafalgar House Public Ltd. , 977 F. Supp. 95, 96 & n.1 (D.P.R. 1997); In re San Juan Dupont Plaza Hotel Fire Litig., 745 F. Supp. 79, 84 (D.P.R. 1990).

A

We must first address a threshold question: do federal choice-of-law rules govern the Calhouns' damage claims? The appropriate choice-of-law rules to be applied is controlled by the basis for our federal jurisdiction, or power to adjudicate the Calhouns' claims. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 89 (1998). It is axiomatic that a federal court sitting in diversity must apply the choice-of-law rules of the state in which it sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); see also Assicerazoni General, S.P.A. v. Clover, 195 F.3d 161, 164 (3d Cir. 1999). As such, if our jurisdiction were to be based upon diversity principles, the District Court would be bound to apply Pennsylvania choice-of-law rules insofar as the Calhouns instituted their action against Yamaha in the Eastern District of Pennsylvania. If, however, our jurisdiction were to be grounded in admiralty, federal choice-of-law principles, first identified in Lauritzen v. Larsen, 345 U.S. 571 (1953), would apply. See, e.g., Aqua-Marine Constructors, Inc. v. Banks, 110 F.3d 663, 670 (9th Cir.), cert. denied sub nom, Polaris Ins. Co. v. Aqua-Marine Constructors, Inc. , 522 U.S. 933 (1997); Complaint of Kreta Shipping, S.A. , 1 F. Supp. 2d 282, 284-85 (S.D.N.Y. 1998); AGIP Petroleum Co. v. Gulf Island Fabrication, Inc., 920 F. Supp. 1318, 1323 (S.D. Tex. 1996).

The Calhouns initially averred that the District Court properly could exercise subject matter jurisdiction over their claim pursuant to 28 U.S.C. S 1333, which provides the federal courts with jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. S 1333(1).9  See Calhoun, 40 F.3d at 626

_____

9. In this initial appeal, the panel determined that the District Court could have exercised subject matter jurisdiction over the Calhouns' action pursuant to the admiralty provision of section 1333. The Supreme Court issued a similar statement in its opinion. See Yamaha, 516 U.S. at 206. Insofar as this determination was not necessary to either court's ultimate holding, however, it properly is classified as dictum. It therefore
does not possess a binding effect on us pursuant to the "law of the case" doctrine. See, e.g., In re City of Phila. Litig., 158 F.3d 711, 717 (3d Cir.
1998); Coca-Cola Bottling Co. v. Coca-Cola Co. , 988 F.2d 414, 429 (3d Cir. 1993) (citing Arizona v. California, 460 U.S. 605, 618 (1983)).

n.5. In an attempt to ensure the use of Pennsylvania's wrongful death and survival statutes, however, the Calhouns quickly withdrew from this position. Indeed, given the fact that the accident giving rise to this action involved the operation of a recreational -- as opposed to a commercial -- water vehicle, see Ex Parte Easton, 95 U.S. 68, 72-73 (1877), an application of admiralty jurisdiction would appear -- at first blush -- misplaced here. The Supreme Court's previous holding, authorizing the Calhouns' use of a state law remedy to obtain damages as relief for Natalie's death, see Calhoun, 516 U.S. at 216, further suggests that the present matter falls outside of our admiralty jurisdiction.

Before 1972, the Supreme Court adhered to what was known as the "locality test," which authorized the exercise of admiralty jurisdiction in all matters in which the incident giving rise to the cause of action occurred on the navigable waters of the United States. See, e.g., Victory Carriers, Inc. v. Law, 404 U.S. 202, 205 n.2 (1971); The Plymouth, 70 U.S. (3 Wall.) 20, 35 (1865). In Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249 (1972), however, the Court abandoned the use of the locality test in a case concerning an airplane that crashed into Lake Erie shortly after takeoff. See id. at 250, 261. The Court replaced the locality test with an analysis that required a court to determine whether the incident in question bore a "significant relationship to traditional maritime activity." Id. at 268. Holding that an airplane crash did not bear such a relationship to traditional maritime activity, the Court held that the exercise of admiralty jurisdiction was not appropriate. See id.

The Court further explained the Executive Jet standard in Richardson v. Foremost Ins. Co., 457 U.S. 668 (1982). In Richardson, two boats that were being used for recreational purposes -- but had never been utilized for commercial purposes -- had collided on the Amite River in Louisiana. See id. at 669. Notwithstanding the lack of any nexus to commercial activity, and citing the need for uniform rules of conduct and the fact that a pleasure boat collision could potentially impact maritime commerce, the Court held that "the negligent operation of a vessel on navigable waters . . .

ha[d] a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction." Id. at 674-75.10 In so holding, the Court stated that the incident giving rise to the claim in question must have some impact on maritime commerce to support admiralty jurisdiction, but that the collision of two pleasure boats satisfied such a requirement. See id. at 675.

The Court reemphasized these principles in Sisson v. Ruby, 497 U.S. 358 (1990), where the Court held that admiralty jurisdiction was available to adjudicate a cause of action concerning a fire that started on board a pleasure yacht, and proceeded to damage several other boats as well as the marina at which the owner docked the yacht. See id. at 360. Indeed, the Court held that "the need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial." Id. at 367 (emphasis added).

Turning to the present appeal, the Yamaha WaveJammer that Natalie was operating at the time of her death is a type of pleasure craft that is almost exclusively used for recreational purposes. Nevertheless, the Court's recent jurisprudence -- namely, Richardson and Sisson -- indicates that so long as the incident in question, and the vehicles utilized therein, bears some relation to traditional maritime activity and could, in any way, impact upon the flow of maritime commerce, admiralty jurisdiction is proper. See generally 1 U.S.C. S 3 ("The word`vessel' includes every description of watercraft or other artificial contrivance use,

_____

10. Although it announced a rule that appeared to sanction the expanded use of admiralty jurisdiction, the Court cautioned that "[n]ot every accident in navigable waters that might disrupt maritime commerce will support admiralty jurisdiction." Id. at 675 n.5. In this vein, the Court cited its opinion in Executive Jet, arguing that although an airplane crash in navigable waters might interfere with maritime commerce, such an accident did not possess the requisite connection to traditional maritime activity. See id. We, however, have recently suggested that admiralty jurisdiction would extend even to a simple slip and fall that occurred on a cruise line. See Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 73 (3d Cir. 1996).

or capable of being used, as a means of transportation on water." (emphasis added)).

Further, much like the collision at issue in Richardson, the collision between the two vessels in the instant matter bears some impact, however remote, on maritime commerce. In particular, the vessel that Natalie struck could have been a commercial boat, or the ensuing investigation into the crash could have made commercial navigation in and around the marina difficult. 11 Indeed, the accident at issue here is virtually identical to the accident that occurred in Richardson, and as such, we hold that we properly exercise jurisdiction over this matter pursuant to the admiralty provisions of 28 U.S.C. S 1333(1). We are therefore satisfied that the District Court was correct in applying federal choice-of-law principles in determining which law on damages should be applied to this case. 12

_____

11. The Court has continuously directed that in examining an incident's nexus to maritime commerce for the purposes of admiralty jurisdiction, a court must look not only to the specific impact that the particular incident had on such commerce, but to "the potential impact of [the] incident by examining its general character." Sisson, 497 U.S. at 363. For instance, the Richardson Court determined that although the collision of those particular pleasure boats in the Amite River did not threaten maritime commerce, if the same collision were to have occurred in the mouth of the St. Lawrence River, the impact on maritime commerce would have been serious. See Richardson , 457 U.S. at 675. This latter conclusion, the Court held, provided the District Court with admiralty jurisdiction. See id.

12. We also hold that the District Court did not err in employing the doctrine known as "depecage." The Calhouns strongly argue against the application of this doctrine, offering as support our opinion in Broome v. Antlers' Hunting Club, 595 F.2d 921 (3d Cir. 1979). In Broome, sitting in diversity, we predicted that although the Pennsylvania courts had yet to issue a definitive opinion either approving or disfavoring the use of depecage, the Pennsylvania courts would likely approve the use of the doctrine. See id. at 923-24. Nevertheless, as we are obliged to apply federal choice-of-law principles, Broome is inapposite. We note that a number of district courts within this circuit have utilized depecage, see, e.g., City of Rome v. Glanton, 958 F. Supp. 1026 (E.D. Pa. 1996); Chemetron Investments v. Fidelity & Casualty Co., 886 F. Supp. 1194, 1199 (W.D. Pa. 1994), and that the doctrine has obtained support in our sister circuits. See, e.g., Spinozzi v. ITT Sheraton Corp., 174 F.3d 842, 848 (7th Cir. 1999); Johnson v. Continental Airlines Corp., 964 F.2d 1059, 1062 (10th Cir. 1992).

B

Federal choice-of-law rules in the admiralty arena are governed by the Supreme Court's opinion in Lauritzen v. Larsen, 345 U.S. 571 (1964). In Lauritzen , the Court held that

> Maritime law, like our municipal law, has attempted to avoid or resolve conflicts between competing laws by ascertaining and valuing points of conflict between contact between the transaction and the states or government between the transaction regulated and the states or governments whose competing laws are involved. The criteria, in general, appear to be arrived at from weighing of the significance of one or more connecting factors between the shipping transaction regulated and the national interest served by the assertion of authority.

Id. at 582.

The Court identified seven factors for courts to weigh in rendering choice-of-law decisions: place of the wrongful act, law of the flag, allegiance or domicile of the injured, allegiance of the defendant shipowner, place of contract, inaccessibility of a foreign forum, and the law of the forum. See id. at 583-91. Many of these factors (e.g., law of the flag, allegiance of the defendant shipowner, and inaccessibility of a foreign forum), however, do not apply to the present dispute, which concerns entirely domestic interests.

Lauritzen itself involved a choice between the law of the United States and that of Denmark, see id. at 573-74, and, indeed, the Lauritzen factors are most often applied to determine whether the admiralty law of the United States or that of a foreign state should be applied to a particular dispute. See, e.g., Carbotrade S.p.A. v. Bureau Veritas, 99 F.3d 86, 89 (2d Cir. 1996); Zacaria v. Gulf King 35, Inc., 31 F. Supp. 2d 560, 563 (S.D. Tex. 1999). The Lauritzen Court recognized this focus on international disputes. See Zacaria, 31 F. Supp. 2d at 563 ("Generally, the law of the flag and the defendant shipowner's base of operations weigh most heavily in the determination." (citing Lauritzen, 345 U.S. at 583)).

12

Nevertheless, we had the opportunity to apply the Lauritzen analysis to a purely domestic tort action in Scott v. Eastern Air Lines, Inc., 399 F.2d 14 (3d Cir. 1968). In Scott, an airplane bound for Atlanta -- with a layover in Philadelphia -- took off from Logan Airport in Boston only to crash into Boston Harbor shortly thereafter. See id. at 18-19. The survivors of one of the passengers on board that flight sued the airline in both tort and contract, and we determined, with respect to the tort issues, that the Lauritzen factors would govern whether Massachusetts or Pennsylvania law would apply. See id. at 25. We determined that the Lauritzen factors, viewed as a whole, represented a departure from the application -- in admiralty cases -- of the lex loci delecti[13] rule and a move toward analyzing which state had the most significant relationship to the incident and the dominant interest in having its law applied. [14] See id. at 28-29.

We held that because the crash that occurred in Boston Harbor was purely fortuitous or adventitious, Massachusetts had a very limited relationship to the accident that gave rise to the cause of action and therefore had little interest in having its law applied. See id. at 28. On the other hand, because Pennsylvania was the decedent's domicile, the situs of his ticket purchase, and the administration of his estate, Pennsylvania had the most significant relationship to the action, as well as the dominant interest in having its law applied. See id.

_____

13. The lex loci delecti doctrine requires courts to apply the law of the state in which the tort occurred. See Griffith v. United Air Lines, 203 A.2d 796, 805 (Pa. 1964).

14. The "most significant relationship" analysis is that which has been advocated by the American Law Institute's Second Restatement on Conflicts of Law. See Restatement (Second) of Conflicts of Law S 145 (1971). As we explained in Scott, the Restatement itself had cited Lauritzen as an example of the "most significant relationship" standard. See Scott, 399 F.2d at 28 n.9 (citing Restatement (Second) of Conflict of Laws, S 145 Reporter's Note at 20 (Proposed Official Draft, Part II, 1971)). The Second Restatement includes, as a relevant part of this analysis, an inquiry into which state has the dominant interest in having its law applied. See Restatement (Second) of Conflicts of Law S 145 cmt. b.

The Calhouns argue that because Natalie did not intend for the WaveJammer she was operating to lose control, the fact that she was killed in Puerto Rico was just as fortuitous as the incident that occurred in Scott, and that therefore Puerto Rico has little, if any, relationship to the accident and little interest in having its law applied. We disagree. If we were to accept the Calhouns' interpretation of the Scott court's concept of fortuity, virtually every accidental injury would qualify as "fortuitous," thus diluting to the point of extinction any application of the law of the state in which an injury or death occurred. Although we agree that the Supreme Court has expressed a dislike for a rote application of the lex loci delecti doctrine, we believe that the Court intended a rule that balanced, rather than displaced, the various states' interests.

The airplane in Scott could have crashed anywhere -- Boston Harbor, the Hudson River, or Long Island Sound -- it was merely chance that the plane went down in the territorial waters off the coast of Massachusetts, as opposed to, for instance, New York or New Jersey. Here, however, Natalie intentionally traveled to Puerto Rico and intentionally operated the WaveJammer in Puerto Rico's territorial waters. This being so, there was no possibility that Natalie's accident could have occurred anywhere other than in Puerto Rico.

Courts within this Circuit have held that the concept of "fortuitous injury" cannot be invoked in an effort to avoid application of the law of state in which the injury occurred when the injured (or deceased) intentionally traveled to the location of the accident. See, e.g., Tonkon v. Denny's, Inc., 650 F. Supp. 119, 121 (E.D. Pa. 1986) ("When a party voluntarily and intentionally travels to another state, the location of an injury incurred there is not fortuitous." (citing Blakesley v. Wolford, 789 F.2d 236, 249 (3d Cir. 1986)). We have held that once a court classifies an activity or accident as non-fortuitous in nature," `the place of the injury assumes much more importance, and in some instances may be determinative.' " LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1072 (3d Cir. 1996) (quoting Shuder v. McDonald's Corp., 859 F.2d 266, 272 (3d Cir. 1988)); Shields v. Consolidated Rail Corp., 810 F.2d 397, 401 (3d Cir. 1987)).

14

Here, as we have related, Natalie voluntarily traveled to Puerto Rico and boarded, as well as operated, the WaveJammer that ultimately caused her death. The sole relationship that Pennsylvania enjoys with this incident is that the Calhouns -- and Natalie prior to her death -- were Pennsylvania domicilliaries, as well as the fact that Natalie's estate will be administered in Pennsylvania. Although these ties are certainly relevant, they do not outweigh the more prominent relationship that Puerto Rico, as the situs of the injury, has with this litigation. These principles therefore counsel in favor of the application of the law of Puerto Rico on the issue of both compensatory and punitive damages.

As stated above, however, we must also inquire into which state has the most dominant interest in having its law applied to this litigation. Viewed in this manner, and through the lens of the depecage doctrine, both Pennsylvania and Puerto Rico each have significant interests in having its respective law applied to the different types of damages that the Calhouns seek through their complaint.

The purpose of compensatory damages is "to make the plaintiff whole." Feingold v. SEPTA, 517 A.2d 1270, 1276 (Pa. 1986); see also Saldana Sanchez v. Vega Sosa, 175 F.3d 35, 36 (1st Cir. 1999). Given that the individuals who seek to be made whole -- the Calhouns and Natalie's estate -- are all Pennsylvania domicilliaries, it appears as if Pennsylvania has a strong interest in having its law of compensatory damages apply to the present matter. Further, it is hard to dispute that Pennsylvania has a substantial interest in obtaining compensation for its citizens in order to remedy wrongs that have been committed against such individuals. See, e.g. , Blakesley, 789 F.2d at 242 n.11. That interest, however, does not obtain insofar as Puerto Rico is concerned, as the Calhouns have virtually no connection to Puerto Rico. Accordingly, Puerto Rico would have very little interest in either making the Calhouns whole or remedying wrongs that Yamaha may have committed against them.

Punitive damages, on the other hand, are intended to punish wrongdoers and deter future conduct. See, e.g.,

15

Kirkbride v. Lishon Contractors, Inc., 555 A.2d 800, 803 (Pa. 1989); Cass R. Sunstein et al., Assessing Punitive Damages (with Notes on Cognition and Valuation in Law), 107 Yale L.J. 2071, 2081 (1999) (quoting a jury instruction regarding punitive damages as stating "the purpose of such an award is to punish the wrongdoer and to deter that wrongdoer from repeating such wrongful acts"). Although Pennsylvania has an interest in punishing those who harm their citizens, we are persuaded that Puerto Rico's interest in regulating the activity that occurs in its territorial waters-- whether commercial or recreational -- is more dominant. Indeed, the tragic death that befell Natalie easily could have been visited upon a Puerto Rican citizen. Cf. Puerto Rico Act No. 48 (1986) ("The State . . . must be watchful for the owners of vessels, sailors, and water skiers to also be prudent in their enjoyment and practice of their recreational activities, for their benefit and that of the bathers."). Puerto Rico also has an especially strong interest in maintaining the safety of the waterways surrounding the island to preserve the economic benefits it derives from both tourism and other commercial enterprises.[15]

As a result, we hold that the District Court did not err in ruling that it would apply the law of Pennsylvania in the determination of compensatory damages and the law of Puerto Rico in the determination of punitive damages.

IV

The District Court also ruled that state law -- specifically, the law of Puerto Rico -- would be applied in order to determine whether Yamaha was substantively liable for Natalie's death. As earlier noted, the District

_____

15. The Calhouns argue that Puerto Rico cannot have a dominant interest in the application of its law on punitive damages because Puerto Rico has rejected the use of punitive damages as a deterrent measure. Such an argument, however, miscomprehends the nature of our inquiry. The appropriate question is not whether Puerto Rico's specific interest in the application of its law on punitive damages is dominant as compared to Pennsylvania's, but rather, whether the state in which the injury occurred has a dominant interest in the application of its law on punitive damages as compared to the state of the plaintiff 's domicile.

16

Court's interlocutory order asked us to answer the
following:

> 3. Did [the District Court] err in deciding, on remand,
> that the jurisdiction whose substantive liability law is
> the source of the Calhouns' claims is Puerto Rico?

Calhoun, 40 F. Supp. 2d at 298.16  We hold that the answer
given by the District Court, that the law of Puerto Rico
would govern, was erroneous. Our holding to this effect
obliges us to reverse that part of the District Court's order.

The answer to the District Court's question revolves
around the proper interpretation of a number of Supreme
Court opinions concluding with the Court's opinion in the
instant matter. Prior to 1970, actions for wrongful death in
admiralty were governed by the Supreme Court's decision,
during the Court's 1886 term, in The Harrisburg , 119 U.S.
199 (1886). In The Harrisburg, the Court held that because
Congress had not seen fit to provide a cause of action for
wrongful death in admiralty cases, it would be
inappropriate for the federal courts to create such a cause
of action from federal common law. See id. at 213. In so
ruling, the Court stated that "[t]he rights of persons in this
particular [action] under the maritime law of this country
are not different from those under the common law, and [ ]

---

16. This issue is more than a merely academic exercise. As counsel for
the Calhouns indicated at oral argument, Pennsylvania law would bar
any attempt by Yamaha, under a comparative negligence theory, to
introduce evidence of Natalie's negligence in operating the WaveJammer
in order to limit its own liability. See Fray v. Harley Davidson Motor
Co.,
734 A.2d 1, 10 (Pa. Super. Ct. 1999) ("The general rule [is] that
contributory and comparative negligence are not defenses to a strict
products liability action."), appeal denied , Nos. 924–926, 2000 WL 60053
(Pa. Jan. 19, 2000); Jara v. Rexworks, Inc., 718 A.2d 788, 793 (Pa.
Super. Ct. 1998). On the other hand, a plaintiff 's comparative negligence
is a proper defense to a cause of action sounding in admiralty. See
United States v. Reliable Transfer Co., 421 U.S. 397, 411 (1975) ("We
hold that when two or more parties have contributed by their fault to
cause property damage . . . damages [are] to be allocated equally only
when the parties are equally at fault or when it is not possible fairly to
measure the comparative degree of their fault."); see also Farr v. NC
Mach. Co., 186 F.3d 1165, 1167 (9th Cir. 1999); In re: Sinclair Navigation
Corp., 529 F.2d 744 (5th Cir. 1976).

17

it is the duty of courts to declare the law, not to make it."
Id. at 213-14. The Court's holding in The Harrisburg
therefore forced plaintiffs such as the Calhouns to rely
exclusively upon state causes of action if they sought to
obtain a remedy for an allegedly wrongful death in United
States territorial waters.

After The Harrisburg, a trilogy of Supreme Court opinions
decided between 1959 and 1960 informed lower courts that
when exercising their admiralty jurisdiction, they were
required to apply state law completely -- with respect to
both procedural and substantive issues. See Goett v. Union
Carbide Corp., 361 U.S. 340 (1960); Hess v. United States,
361 U.S. 314 (1960); The Tungus v. Skovgaard, 358 U.S.
588 (1959). Representative of this trilogy was The Tungus v.
Skovgaard, 358 U.S. 588 (1959), in which the Court held
that

> decisions of this Court long ago established that when
> admiralty adopts a State's right of action for wrongful
> death, it must enforce the right as an integrated whole,
> with whatever conditions and limitations the creating
> State has attached.

Id. at 592. Importantly, the Court in The Tungus expressly
based this language upon its holding in The Harrisburg. See
id. Because no federal statute provided a cause of action for
wrongful death in territorial waters, The Harrisburg and The
Tungus suggested that courts entertaining such causes of
action were to apply state law liability standards. Indeed,
the Court explicitly held in Hess v. United States, 361 U.S.
314 (1960), that "in an action for wrongful death in state
territorial waters, the conduct said to give rise to liability is
to be measured not under admiralty's standards of action,
but under the substantive standards of the state law." Id.
at 319.

This principle, through which the states remained a
virtually equal participant in regulating the means by which
an individual could obtain relief for another's death on the
water, seemingly changed as a result of the Supreme
Court's opinion in Moragne v. United Marine Lines, Inc., 398
U.S. 375 (1970). In Moragne, the Court overruled The
Harrisburg and created a federal cause of action under the

18

federal common law for wrongful death to provide a remedy for survivors of seamen killed in territorial waters. See id. at 409. Indeed, The Moragne Court stated that the rule adopted in The Harrisburg "had little justification except in primitive English legal history -- a history far removed from the American law of remedies for maritime deaths." Id. at 379.

The Moragne Court did not, however, expressly overrule the trilogy of The Tungus, Hess, and Goett. Rather, the Court stated that the genesis of the jurisprudential nightmare that resulted in the Court's holding in Moragne could be found in The Harrisburg, not The Tungus. See id. at 378 ("[W]e have concluded that the primary source of the confusion is not to be found in The Tungus, but in The Harrisburg . . . ."). Although the Court declined to overrule The Tungus expressly, we could argue, were it not for subsequent expressions of our Court and the Supreme Court itself, that with the demise of The Harrisburg, the Court similarly relegated, sub silentio, opinions such as The Tungus, Hess, and Goett to the jurisprudential scrapheap of history, insofar as such rulings were expressly based upon The Harrisburg. As the District Court recognized, this was also the position taken by most admiralty commentators prior to the institution of this litigation. See, e.g., 2 Richard Ziade, Benedict on Admiralty, S 81e, at 7-17 n. 59 (7th ed. 1999); Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty, S 6-32, at 367 (2d ed. 1975).

The earlier opinions of both our Court and the Supreme Court in the Calhoun/Yamaha controversy to which we have previously referred, however, appear to imply otherwise. Indeed, in our previous Calhoun opinion, we observed that the portion of The Tungus that suggested that the ability of a non-seaman to obtain relief for injury or death occurring in state territorial waters depended on state statutory law "retain[ed] vitality post-Moragne." Calhoun, 40 F.3d at 641 n.39. The Supreme Court echoed our reasoning. See Yamaha, 516 U.S. at 212. The question therefore becomes whether these statements have revived the principle for which The Tungus has become most known -- a court hearing an action in which a party is using a state wrongful death statute to institute an action

in admiralty must apply state law to all issues presented. The District Court answered this question in the affirmative, reasoning that "in this Circuit, The Tungus, with all its Harrisburg-era warts, remains good law with respect to the proposition that `rights of non-seaman [sic] killed in state territorial waters depend on state wrongful death statute.' " Calhoun, 40 F. Supp. 2d at 295. From this principle, the District Court extrapolated that"[t]he substantive rights of those suing derivatively from, or in the name of, nonseafarers killed in the territorial waters of a state have their source in state law." Id.

We respectfully disagree. We believe that The Tungus remains good law only with respect to its broader proposition concerning the role that state regulation may play in the admiralty arena. The Supreme Court has lent credence to this broader proposition by authorizing the Calhouns' use of Pennsylvania's wrongful death/survival statute only as the vehicle through which they may prosecute their action. The more specific holding of The Tungus, however -- that federal courts must apply all facets of state law when a plaintiff seeks to proceed by way of a cause of action grounded in state law -- was effectively overruled in Moragne once the Court invalidated the reasoning advanced by the Court in The Harrisburg. The Tungus's emphasis on the usage of the particulars of state law was specifically trained on the fact that federal law (both statutory and common law) did not provide a cause of action for wrongful death on the water. This was the very precept that was universally struck down in Moragne, through which the Supreme Court created such a cause of action. As such, The Tungus's remaining vitality rests only upon the limited proposition announced by the Supreme Court earlier in this very litigation -- that state law may provide a procedure or a vehicle through which a plaintiff may institute an action to remedy death in territorial waters.

The District Court's holding also failed to take account of the prevailing policy that has guided the advancement of federal admiralty law and regulation: uniformity. Creating a uniform system by which activities and events on the waters of the United States would be adjudicated was such

20

a matter of concern to the Framers that they placed admiralty as among the powers of the newly-created federal government. See U.S. CONST. art. I, S 8, cl. 10 (granting Congress the power "[t]o define and punish Piracies and Felonies committed on the high seas"). The Supreme Court addressed the importance of uniformity in the maritime arena in Richardson: "The federal interest in protecting maritime commerce . . . can be fully vindicated only if all operators of vessels on navigable waters are subject to uniform rules of conduct . . . ." Richardson , 457 U.S. at 674-75; see also Sisson, 497 U.S. at 367 ("[T]he need for uniform rules of maritime conduct and liability is not limited to navigation, but expands at least to any other activities traditionally undertaken by vessels.").

Uniformity, as Yamaha forcefully argues, is a rather strong concern in the instant matter. If we were to adopt the District Court's holding that the substantive standards by which an admiralty defendant's liability is adjudged is governed by the law of the state in which the alleged injury occurred, there would be no uniformity in such standards. Cf. Ellis v. Riverfront Enterprises, Inc., 957 F. Supp. 105, 106 (E.D. Ky. 1997) (stating that " `[p]rinciples of federalism counsel that only when the federal interest in uniformity outweighs other interests at stake should admiralty jurisdiction deprive the state of its traditional control over personal injury claims.' "). Indeed, such uniformity concerns informed the Moragne Court's decision to overrule The Harrisburg. See Moragne, 398 U.S. at 401 ("Our recognition of a right to recover for wrongful death under general maritime law will assure uniform vindication of federal policies, removing the tensions and discrepancies that have resulted from the necessity to accommodate state remedial statutes to exclusively maritime substantive concepts." (emphasis added)).

Accordingly, we hold that federal maritime standards govern the adjudication of a defendant's (here, Yamaha's) putative liability in an admiralty action brought pursuant to a state wrongful death/survival statute.17

_____

17. We note that we are not alone in setting forth the above reasoning in the wake of the Supreme Court's ruling in the instant matter. Indeed, the Southern District of New York has held that

21

V

We conclude by summarizing our answers to the certified questions:

1. Should punitive damages be determined by the la w of Puerto Rico? We have answered "yes," and in so doing, we affirm the order of partial summary judgment entered by the District Court on March 22, 1999.

2. Should compensatory damages be determined by the law of Pennsylvania? We have answered "yes," and in so doing, we affirm the order of partial summary judgment entered by the District Court on March 22, 1999.

3. Is the law of Puerto Rico to be applied to dete rmine the liability of Yamaha? We have answered "no," and in so doing, we reverse this portion of the order entered by the District Court on March 22, 1999, and remand this matter to the District Court for further proceedings consistent with this opinion.

Each party will bear its own costs.

_____

[t]he thrust of Yamaha [516 U.S. 199] is to argue that considerations of uniformity in federal maritime wrongful death action require only that standards of liability be exclusively determined by federal maritime law and that, once such liability has been shown, there is no antagonism to such a policy in supplementing federal remedies with those available under otherwise applicable state statutes.

O'Hare v. Celebrity Cruise Lines, Inc., 979 F. Supp. 254, 256 (S.D.N.Y. 1997). The O'Hare court termed any indication in Yamaha to the contrary as "Delphic." See id. at 256 n.1.

22

NYGAARD, J., concurring and dissenting.

I take little issue with most of the majority's carefully crafted opinion. I do, however, respectfully part ways with its choice of Puerto Rican law, and conclusion that the Estate of Natalie K. Calhoun should be denied punitive damages.

As the majority correctly points out, a federal court sitting in diversity applies the forum state's choice of law rules. See Klaxon Co. v. Stentor Elec. Mfg. Co. , 313 U.S. 487 (1941). This requires that we weigh the interests of the jurisdictions involved and consider how these interests are related to the specific issues involved in the conflict. See Laurtizen v. Larsen, 345 U.S. 571, 582 (1953).

Contacts considered vital in determining the state of most significant relationship include: place of injury, place of conduct, domicile of the parties, and the place where the relationship between the parties is centered. See Restatement (Second) of Conflict of Laws S145(2) (1971). The importance of the respective contacts is determined, in part, by considering the issues, the nature of the tort, and the purposes of the tort rules involved. Id. at S 145 (comments c-f).

The District Court relied exclusively on the fact that Puerto Rico does not provide punitive damages as part of its damages scheme:

> [The] purposes [of punitive damages] appear to be the community purposes of the state or community in which the tortious activity takes place. The fact that Puerto Rico does not have a regime of punitive damages reflects a community determination that Puerto Rico for its reasons does not think that punitive damages are the instrument . . . through which it wishes to pursue . . . punishment on the one hand and deterrence on the other.

Calhoun v. Yamaha Motor Corp., 40 F. Supp. 2d 288, 291 (E.D. Pa. 1999).

The District Court further opined that since the chief purposes of punitive damages are to deter and punish, rather than compensate the victims, the public policy of

23

Puerto Rico, a Commonwealth that has elected not to employ punitive damages as an instrument of deterrence and punishment, should govern as to this aspect of damages, instead of the public policy of Pennsylvania. See id.; see also Calhoun v. Yamaha Motor Corp. , 1998 WL 717430 (E.D. Pa. 1998). However, under the modern interest-analysis conflict of laws approach that is followed by the majority of states including Pennsylvania, the law of the state with the greatest interest in furthering the public policy behind its punitive damages scheme should govern.

Puerto Rico has little interest in the outcome here. In contrast, Pennsylvania's interest in the amount of recovery in wrongful death cases is great. The Constitution of Pennsylvania, Article III, Section 21 P.S. (cited in Griffith v. United Air Lines, 203 A.2d 796, 807 (Pa. 1964)) states:

> The General Assembly may enact laws requiring the payment by employers, or employers and employees jointly, of reasonable compensation for injuries to employees arising in the course of their employment ***; but in no other cases shall the General Assembly limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property, and in case of death from such injuries, the right of action shall survive ***. (emphasis added).

Punitive damages are appropriate in Pennsylvania when the act committed, in addition to causing actual damages, constitutes "outrageous conduct," either through reckless indifference or bad motive. See McClellan v. Health Maintenance Org. of Pennsylvania, 604 A.2d 1053, 1061 (Pa. Super. 1992); see also Feld v. Merriam, 485 A.2d 742, 747-48 (Pa. 1984). We have held that three factors should be considered when awarding punitive damages: (1) the character of the act; (2) the nature and extent of the harm caused; and (3) the wealth of the defendant. See Donaldson v. Bernstein, 104 F.3d 547, 557 (3d Cir. 1997)(citing Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800, 803 (Pa. 1989)). See also Restatement (Second) of Torts S 908(2) (regarding imposition of punitive damages adopted in Pennsylvania).

Here, the defendant, a Japanese corporation, (tortious actor) defectively manufactured a jet ski in Japan (character

24

of act), the tortious act resulted in the death of a Pennsylvania resident while riding the defective jet ski (extent of harm caused), and the defendant is a very large multi-national corporation (wealth of the defendant). These factors indicate Pennsylvania's interest in awarding punitive damages to the Calhouns. They also evince Puerto Rico's little interest in the outcome of the lawsuit. The fatal accident did not occur to a Puerto Rican citizen, the plaintiff is not Puerto Rican, the outrageous conduct was not committed by a Puerto Rican, and the only connection Puerto Rico has is that the accident happened to have occurred there. The District Court's reliance on the "community purposes of the state in which the tortious activity took place" is misplaced, because the"tortious activity" at issue in this case -- the allegedly defective design and manufacture of the jet ski -- did not occur in Puerto Rico. Rather, the jet ski was designed and manufactured by a Japanese corporation in Japan.

The Supreme Court has held that punitive damages may properly be imposed to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition. See BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996). By my analysis, Pennsylvania has a more legitimate interest in getting the punitive damages awarded for the wrongful death of one of its residents than Puerto Rico has in protecting one of its citizens from an excessive verdict by precluding the award of punitive damages.

The Pennsylvania Supreme Court has held that compensation of an injured plaintiff is primarily a concern of the state in which the plaintiff is domiciled. Griffith, 203 A.2d at 806. The only interest of the state of injury would be in the compensation of those who rendered medical aid and other assistance to the injured parties. Id.  Where, as here, immediate death occurs, the state has no such interest. Id. at 807. Thus, under Pennsylvania law, Puerto Rico has no interest in the compensation of this decedent's estate. Pennsylvania, on the other hand, has a very strong interest in seeing that one of its residents is compensated under a wrongful death claim, and that an outrageous and tortious act be punished to deter the defendant from continuing its behavior.

25

In my view, this result is consistent with Scott v. Eastern Air Lines, Inc., 399 F.2d 14 (3d Cir. 1968), cert. denied, 393 U.S. 978 (1968). In Scott, the following contacts were crucial to our decision: the decedent was domiciled in Pennsylvania; the letters of administration were granted by the Register of Wills of Philadelphia County; the decedent's personal property was located in Pennsylvania; the decedent's relationship with the defendant began in Pennsylvania, and the defendant did business in Pennsylvania. See 399 F.2d at 22.

The facts in Scott are very similar to the facts here: (1) the decedent in Scott was in Boston voluntarily and Natalie was in Puerto Rico voluntarily; (2) the decedent in Scott got on a plane in Boston voluntarily and Natalie got on the jet-ski in Puerto Rico voluntarily; (3) the decedent in Scott was killed in Boston and Natalie was killed in Puerto Rico; (4) the decedent in Scott was a Pennsylvania resident as was Natalie; and (5) the decedent's estate in Scott was settled in Pennsylvania, Natalie's estate is to be settled in Pennsylvania, and Yamaha does business in Pennsylvania, including advertising and distributing its products. In contrast, Puerto Rico's sole contact with the incident in question is that Natalie's death occurred in its territorial waters. Thus, under the ratio decidendi of Scott, Puerto Rico (like Massachusetts in Scott), the state where the accident occurred, has no interest in the outcome of the litigation.

In LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069 (3d Cir. 1996), a Pennsylvania resident was injured at his regular workplace in Delaware. In LeJeune the cornerstone of our conclusion that Delaware was not a fortuitous place of injury, was the fixed location of the plaintiff 's workplace, the regularity of his presence there, and the fact that the majority of the wrongful conduct occurred in Delaware. Neither Scott nor LeJeune defines the concept of fortuity. However, as the Calhouns argue and I agree, Natalie's brief vacation in Puerto Rico is more akin to that of the plaintiff in Scott than to the status of the plaintiff in LeJeune who came to Delaware every day to work.

Other Circuits provide some guidance. In airplane crash cases, for example, the place of injury is much more fortuitous than the place the defendant selects as his place

26

of incorporation and principal place of business or the place of misconduct. In In re Air Crash Near Chicago, 644 F.2d 594, 615 (7th Cir. 1981); cert. denied, 454 U.S. 878 (1981), the court held that the state where an injury occurs has less interest in deterrence and less ability to control behavior by deterrence or punishment than the state where the plaintiff is domiciled or the state where the misconduct occurred. In La Plante v. American Honda Motor Co., Inc., 27 F.3d 731 (1st Cir. 1994), the court applied Rhode Island law to govern a products liability action brought by an army mechanic stationed in Colorado against Honda in his home state of Rhode Island for injuries sustained in Colorado while operating a vehicle designed and manufactured by Honda. In rejecting the law of the place of injury, the La Plante court gave significant weight to the fact that the tortious conduct that gave rise to the plaintiff 's claim occurred not in Colorado, but in Japan, where the car was designed. Id. at 741.

In Villaman v. Schee, 1994 WL 6661 at *4 (9th Cir. 1994), the court held that because Arizona tort law was designed in part to deter negligent conduct within its borders, Arizona had a stronger interest in the application of its laws allowing for full compensatory and punitive damages than Mexico did, whose limitation of tort damages, like Puerto Rico's, was designed to protect its residents "from excessive financial burdens or exaggerated claims." If the defendants in this case were Puerto Rican residents, then Puerto Rico's interest in protecting its residents from excessivefinancial burdens might be somewhat compelling. However, Puerto Rico has no resident to protect and I conclude it has no interest in denying either punishment or full recovery to non-residents.

Although punitive damages may be the medium of deterrence, the result and purpose of punitive damages is to protect citizens. I would hold that the District Court erred by concluding that the Calhouns' punitive damages claim is governed by Puerto Rico law.

27

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

28